```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          15 Cr. 643 (PKC)

 5   GARY HIRST,

 6                   Defendant.

 7   ------------------------------x
                                        September 15, 2016
 8                                      10:00 a.m.

 9   Before:
                        HON. P. KEVIN CASTEL
10
                                        District Judge
11                                        and a Jury

12
                             APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   BY:  BRIAN R. BLAIS
          AIMEE HECTOR
16        REBECCA G. MERMELSTEIN
          Assistant United States Attorneys
17
     SHER TREMONTE LLP
18        Attorneys for Defendant
     BY:  MICHAEL TREMONTE
19        JUSTINE A. HARRIS
          NOAM KORATI BIALE
20

21   ALSO PRESENT:
          SPECIAL AGENT SHANNON BIENIEK, FBI
22        ELLIE SHEINWALD, Paralegal
          GARY SMITH, Paralegal
23        RYAN POLLOCK, Paralegal

24

25
```

1            (Trial resumed; jury not present)

2            THE COURT:  I understand that all jurors are not here

3       at the moment.  I'm instructing my deputy to alert me as soon

4       as they are.

5            I understand there's an issue the parties want to

6       raise?

7            MS. HECTOR:  Just a brief issue, your Honor.  I

8       inquired of the defense whether they plan to ask Mr. Hlavsa a

9       particular question, and that is whether he had ever heard of a

10      connection between Ymer Shahini and Jason Galanis, because

11      there is some notes in the 3500 along that line.

12           In the 3500, his response to that in deposition

13      testimony is, "I'm not sure if it was previous or at one point

14      in time I overheard or I heard somebody say that, yes."  And it

15      says, "Who do you recall overhearing say that?"  "I don't -- I

16      just don't recall who it was.  I don't know if it was Joe

17      Bianco, I don't know if it was Stephen Weiss.  I don't know who

18      it was.  I don't recall."

19           I don't think it's proper to elicit from there witness

20      that he had overheard someone at some point say that there

21      might be a connection between Ymer Shahini and Jason Galanis

22      because I think it's hearsay.  I just asked Mr. Tremonte does

23      he plan to elicit that, because if so, I'd like it alert the

24      Court and address it now before he asks the question.  He said

25      he thinks he does plan to elicit that, and I just don't see any

proper purpose.  I think it's hearsay.

THE COURT:  Mr. Tremonte, why isn't the answer to your question hearsay?

MR. TREMONTE:  Because it goes to his state of mind. There's going to be a fair amount of evidence presented that Mr. Hlavsa had heard Mr. Shahini's name before.  For example, I expect he will testify, as he testified to some extent yesterday, that he was the CFO of two companies, both of which had significant transactions with Weston, and that testimony was elicited to show that he has familiarity with the transactions that the government alleges Shahini had nothing to do with.  But there's also a reference in -- again, Mr. Shahini was the CFO of another company called fun.com -- I'm sorry -- Mr. Hlavsa was the CFO of another company called fun.com. Mr. Shahini was a major shareholder or major beneficial owner of shares in fun.com.  That information is in a public filing from 2008 which was filed under Mr. Hlavsa's watch.

THE COURT:  Let me ask you a question.  Your question goes to what time period?

MR. TREMONTE:  Everything from the beginning of 2008 to the end of the charged period.

THE COURT:  All right.  Had he ever heard of Shahini?

MR. TREMONTE:  Yes, sir.  And did he understand that there was a connection between Shahini and Galanis.  It goes to his state of mind.  That, together with other evidence that he

1    had that connection in his head.  And the reason why that's

2    important, obviously, is because the government contends that

3    no one had ever heard of Shahini, and anybody who thought of it

4    would have known that Shahini had nothing to do with this

5    Wimbledon transaction, and there's evidence to the contrary,

6    including this statement that he heard about the connection

7    between Galanis and Shahini, and that's corroborated by

8    documents.

9              THE COURT:  Do you want to respond?

10             MS. HECTOR:  Yes, your Honor.  Mr. Hlavsa has

11   testified at various points throughout his testimony that he

12   had not heard of the name Ymer Shahini at that point.  He

13   hadn't heard it at the time he had received the consulting

14   agreement, and that was the first time he had heard of that

15   name.  That's the relevant testimony.  The fact that he says

16   that at some point he heard someone else say that there was

17   some sort of connection between Ymer Shahini and Jason Galanis

18   after the key events in this trial is just hearsay.

19             THE COURT:  I'm going to allow the question, not for

20   the truth of its content but for the fact that it was said, and

21   also as cross examination, and you're going to be free to

22   redirect.  Okay.

23             Let me have marked as Court Exhibit 2 draft jury

24   instructions, which my law clerk will be handing out to you,

25   and I am going to expect you to respond with any comments,

1   corrections, or changes that you propose in letter form no

2   later than 10:00 a.m. Monday.

3          Are our jurors here?

4          THE DEPUTY CLERK:  The light just went on.

5          THE COURT:  Bring them in.

6          The government should be thinking about preparing a

7   redacted indictment, and of course a verdict sheet.

8          Bring the jurors in.

9          (Continued on next page)

```
 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3              JURORS:  Good morning.

 4              THE COURT:  Thanks for being here and ready to go.

 5   We're going to proceed without delay.

 6              Mr. Hlavsa, the Court advises you that you are still

 7   under oath.

 8              THE WITNESS:  Thank you.

 9    MICHAEL HLAVSA,

10        recalled as a witness by the Government,

11        having previously been sworn, testified as follows:

12              MR. TREMONTE:  May I inquire, your Honor?

13              THE COURT:  You may.

14   CROSS EXAMINATION

15   BY MR. TREMONTE:

16   Q.  Good morning, Mr. Hlavsa.

17   A.  Good morning.

18   Q.  Yesterday you testified that you had a meeting with

19   Mr. Manley during which he advised that he had, in fact, signed

20   the consulting agreement, correct?

21   A.  That's my recollection, correct.

22              MR. TREMONTE:  If we could bring up the consulting

23   agreement.  I just want to make certain, Mr. Hlavsa, we're

24   talking about the same document.

25   Q.  This is the document previously marked as Government's
```

1    Exhibit 250.  Do you see that on your screen?

2    A.  I do.

3    Q.  That's the consulting agreement that you discussed with

4    Mr. Manley, correct?

5    A.  Yes.

6    Q.  Turning to the last page, if you would.  On the right,

7    that's Mr. Manley's signature, correct?

8    A.  I don't know if that's his signature.  He did say that he

9    had executed it.

10   Q.  He indicated to you that he signed the agreement, right?

11   A.  Yes.

12   Q.  You have no reason to believe that this is not his

13   signature, right?

14   A.  Correct.

15   Q.  Mr. Manley is somebody that you spent some amount of time

16   with professionally, correct?

17   A.  Yes.

18   Q.  So you know Mr. Manley's temperament, generally.

19   A.  I'm not sure I understand the question.

20   Q.  You're familiar with his personality, correct?

21   A.  In a business relationship sense, I would say yes.

22   Q.  In a business context, Mr. Manley has a mind of his own,

23   correct?

24   A.  I don't know that.

25   Q.  He's a leader?

1   A.  Is that a question?

2   Q.  It is.

3   A.  All right.  So you're asking me if he is a leader?

4   Q.  I am.  Did he strike you as the type of person who had a

5   leader's personality?

6   A.  I believe so.

7   Q.  He didn't strike you as weak willed, right?

8   A.  Correct.

9   Q.  And best you could tell, he can read, correct?

10  A.  Yes, I imagine he can.

11  Q.  All right.  So when he told you that he signed this

12  agreement, you had some confidence that when he signed it,

13  number one, he had read and understood it, right?

14  A.  I'm sorry, I don't know that.

15  Q.  You wouldn't have assumed that Mr. Manley would have signed

16  this document without understanding it, right?

17  A.  I did not discuss the contents of the document with him at

18  the time, I just asked him if he had signed the document.

19  Q.  But I asked you a different question.  Right?  You would

20  not have assumed that Mr. Manley signed this document without

21  understanding its contents, correct?

22          MS. HECTOR:  Objection, calls for speculation.

23          THE COURT:  If you understand the question and you can

24  answer it, you can answer it.

25          THE WITNESS:  I can't make that assumption.

1  Q.  You don't think that Mr. Manley would have signed off on a

2  $2.2 million obligation of the company that he was about to

3  become the CEO of without understanding it, right?

4          MS. HECTOR:  Objection.

5          THE COURT:  Sustained.

6  Q.  Again, you understand the consulting agreement to require

7  the company to pay Ymer Shahini $2.2 million in cash, right?

8  A.  Yes, I do.

9  Q.  And that's an obligation that the company would have to pay

10 without qualification, right?

11 A.  My understanding, the agreement would be without

12 qualification, correct.

13 Q.  That's because the transaction had, in fact, closed, the

14 assets of Wimbledon had been purchased, the price was fixed at

15 $114 million, and under the calculation that's set forth in

16 this agreement, it's $2.2 million owed, right?

17 A.  Yes.

18 Q.  And if the company didn't have the cash to pay, and if

19 Mr. Shahini wanted the money, he could have sued the company,

20 right?

21 A.  I imagine.  I'm not sure.  I'm not sure what legal

22 recourse -- I'm not an attorney, but I would imagine he could

23 have taken collection action against the company.

24 Q.  Right.  And even without being an attorney, it's clear that

25 the company wouldn't have had any strong defense at that point,

1    it owed the money, right?

2    A.  I can't answer that question.  I'm sorry.

3    Q.  Okay.

4    A.  I just have no opinion with respect to the defenses the

5    company would have had.

6    Q.  I'm going to ask you about your understanding.  When you

7    did eventually see the consulting agreement and you had a

8    chance to inspect -- actually, strike it.  I'm going to do it

9    this way.

10            Eventually, you came to inspect the consulting

11   agreement yourself, correct?

12   A.  Yes.

13   Q.  And when you did, you read it with a view to understanding

14   its contents, right?

15   A.  Yes.

16   Q.  And you did in fact so read it?

17   A.  Yes.

18   Q.  And based on your reading of the document, you formed an

19   understanding, independent of any legal opinion, that it

20   represented a $2.2 million obligation of the company, right?

21   A.  Yes.

22   Q.  Now, I'd like to bring up the warrant agreement about which

23   you testified yesterday.  I'm going to put it on the screen so

24   that it's clear we're talking about the same document.

25            That's the warrant agreement that you testified about

1    yesterday?

2    A.   Yes.

3    Q.   And that's Government's Exhibit 251 in evidence.

4         I'd like to direct your attention to one of the

5    paragraphs that you were asked about yesterday.  It's the

6    fourth whereas paragraph on that page, which is now magnified

7    towards the bottom of your screen.

8    A.   Okay.

9    Q.   I want to ask you about that paragraph, but first, let's go

10   through it in bits, beginning at the beginning.

11        It says, "Whereas, the parties agree that the value of

12   the Class 1 warrants being delivered is equal to the fee."  Do

13   you see that piece?

14   A.   I do.

15   Q.   So again, putting this in lay terms, this reflects an

16   agreement as between the two entities that are party to the

17   agreement, right?

18   A.   Yes.

19   Q.   And that agreement, in general, is that the value of the

20   warrants that are being delivered pursuant to this document are

21   equal to the fee, right?

22   A.   Yes.

23   Q.   You had an understanding as to what the fee was, right?

24   A.   Yes.

25   Q.   That's the fee that was owed under the consulting

1    agreement.

2    A.   Correct.

3    Q.   And it says, "As of the date above, as determined by a

4    comparable estimate only," right?

5    A.   Yes.

6    Q.   So the value that the parties are assigning to these

7    warrants is being established by an estimate, right?

8    A.   That's what it says.

9    Q.   And that estimate utilizes a reference price of the 30-day

10   average closing price of the public warrants of the company,

11   right?

12   A.   Yes.

13   Q.   And to be clear, let's just be clear what that is.  The

14   company had warrants that were trading on the Stock Exchange at

15   this time, right?

16   A.   That's correct.

17   Q.   Those warrants could be bought and sold by individuals at

18   the New York Stock Exchange, right?

19   A.   Not at this time.  I think it was the American Stock

20   Exchange at this time.

21   Q.   I'm sorry.  You're right.  It's prior to the purchase of

22   the AMEX by the NYSE.  But the basic point is correct that

23   people could just go and buy and sell the company's warrants,

24   right?

25   A.   Yes.

 1   Q.  The warrants traded at a fraction of the price of the

 2   shares, correct?

 3   A.  I believe so.

 4   Q.  All right.  And those warrants, you could find the price

 5   for those warrants by consulting American Stock Exchange

 6   records, right?

 7   A.  Yes.

 8   Q.  So every day the American Stock Exchange would publish a

 9   closing price for its warrants.

10   A.  Yes.

11   Q.  So establishing the estimate value here wasn't complicated

12   math, at least in principle, you could just go to the exchange

13   records and tally up all of the warrant prices from the prior

14   30 days, and then divide by 30 to get that starting number,

15   right?

16   A.  Yes.

17   Q.  Then once you had that, reading further on, "The holder

18   agrees all claims are settled irrespective of the future value

19   of the Class 1 warrants."  I want to break that down.

20           So the parties to this agreement are saying, look, we

21   agree that whatever disputes we have, whatever claims we may

22   have against each other, those are done, right?

23   A.  I believe that's what it says.

24   Q.  That's one of the effects of this document is to resolve

25   all disputes between the parties, right?

 1   A.  Yes.

 2   Q.  It doesn't actually say what the dispute is, does it?

 3   A.  Not in this sentence, no.

 4   Q.  Okay.  Again, I want to ask you about your understanding

 5   when you read the document the first time, when you read the

 6   document the first time, you understood the claims that were

 7   being settled were essentially Shahini's demand for payment and

 8   the company's inability to pay; is that fair?

 9   A.  It was certainly related to his demand for payment, yes.

10   Q.  No other claims that you knew of that Ymer Shahini had

11   against the company?

12   A.  I did not know any other claims that he had at that time,

13   correct.

14   Q.  He just wanted to get paid the $2.2 million that he was

15   owed under the consulting agreement.

16   A.  That's my understanding.

17   Q.  Okay.  Next line, "Those claims are settled irrespective of

18   the future value of the Class 1 warrants," right?  And that

19   just means, doesn't matter whether the value of these warrants

20   goes up or down, goes to a million or zero, we're done with our

21   dispute.

22   A.  Correct.

23   Q.  And then the last bit of this, "which the holder

24   understands could be valueless if the company's common stock

25   does not appreciate above the strike price of the Class 1

1   warrant before the expiration date set forth herein below."

2   Your understanding of the plain meanings of those words is,

3   everyone understands, even if this becomes worth nothing,

4   Shahini is not going to come back and say, hey, I want my

5   2.2 million.

6   A.  Correct.

7   Q.  So even if the shares go to zero and never come back,

8   company goes bankrupt, he can't look for his money.

9   A.  That's my understanding.

10  Q.  Okay.  Now, I want to bring you back up in the paragraph

11  that says "a comparable estimate only".  Do you see that?

12  A.  I do.

13  Q.  You understand that the reason why this agreed-upon value

14  is an estimate is because it's actually quite complicated to

15  establish at any given point in time the value of warrants,

16  right?

17  A.  I don't believe that's true when there are publicly traded

18  warrants.  So I'm not sure that's true.

19  Q.  Okay.  Well, you're familiar with the Black-Scholes model

20  of options pricing, right?

21  A.  I am.

22  Q.  And that is a model that was arrived at by at least one,

23  maybe two Nobel Prize winning economists for figuring out how

24  you price these securities, right?

25  A.  Yes.

1   Q.  And that model takes into account, among other things, a

2   host of variables having to do with the volume of options or

3   warrants that are traded at any given time, correct?

4   A.  Yes.

5   Q.  Volatility of the underlying security, like the stock,

6   right?

7   A.  Yes.

8   Q.  And one of the reasons why it's so complicated is because

9   there are so many variables that go into determining the price

10  of an option.

11  A.  That's true.

12  Q.  And the warrants here are really just options, correct?

13  A.  Correct.

14  Q.  So even though on the New York Stock Exchange the Gerova

15  warrants were trading at a specified price, whether or not you

16  could actually sell your warrants, your Gerova warrants, would

17  depend on factors other than the stated price, right?

18  A.  That's correct.

19  Q.  So if, for example, during a given week 500 Gerova warrants

20  per day, on average, were trading on the stock exchange, if you

21  walked down to the stock exchange with a million warrants, you

22  might have a hard time getting rid of them, right?

23  A.  I believe so.

24  Q.  You might have to take a very, very steep discount to the

25  stated trading price if there weren't buyers, right?

```
 1   A.  Yes.

 2   Q.  And isn't it also true that at this point in time in late

 3   March of 2010, the volume of trading warrants on the American

 4   Stock Exchange was quite low, right?

 5   A.  I don't have any personal knowledge of that.

 6   Q.  Okay.  So let's bring up what's in evidence as -- it's not

 7   in evidence.  Showing you what's been marked for identification

 8   as Defendant's Exhibit 113.

 9          MR. TREMONTE:  Excuse me, your Honor.  I need to

10   consult.

11          MS. HECTOR:  We have no objection.

12          MR. TREMONTE:  Your Honor, I'd offer this document

13   into evidence without objection from the government.

14          MS. HECTOR:  No objection.

15          THE COURT:  "This document" being?

16          MR. TREMONTE:  "This document" being Defendant's Trial

17   Exhibit 113, which is a spreadsheet indicating the date, price,

18   and volume of publicly traded Gerova warrants on the American

19   Stock Exchange.

20          MS. HECTOR:  No objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 113 received in evidence)

23          MR. TREMONTE:  You can publish that to the jury.

24   BY MR. TREMONTE:

25   Q.  Can you see that, Mr. Hlavsa?
```

 1   A.  I do see it.  Thank you.

 2   Q.  So on the left-hand column up at the top it says "date".

 3   And those dates run in date order from top to bottom.  Do you

 4   see that?

 5   A.  I do.

 6           JURORS:  It disappeared.

 7           THE COURT:  It disappeared.

 8   Q.  And then the next column up at the top, it says "symbol".

 9   Do you see that?

10   A.  I do.

11   Q.  The symbol is always the same, GFCWS.  That's the symbol

12   for Gerova's publicly traded warrants, right?

13   A.  Yes, it is.

14   Q.  That's just a letter designation that the exchange gives to

15   that particular instrument for reference, right?

16   A.  Yes.

17   Q.  And then in the text column up at the top it says "high",

18   column next to that it says "low", and column next to that it

19   says "last", right?

20   A.  Yes.

21   Q.  So that's the high price for any given day, the low price

22   for any given day, and the closing price for any given day,

23   right?

24   A.  That's correct.

25   Q.  And the last column is "volume".  Do you see that?

 1    A.   I do.

 2    Q.   Just looking down the right-hand column, you see that the

 3    volume fluctuates, right?

 4    A.   I do.

 5    Q.   By and large, the volume is in the either single thousands

 6    or tens of thousands, right?

 7    A.   Yes.

 8    Q.   Occasionally, the volume appears to spike.  There are, I

 9    think, two dates, looks like April 14th and May 3rd, where

10    they're trading -- the volume is in the millions, right?

11    A.   Yes.

12    Q.   And then for price, let's just go to March 31st, 2010 for

13    reference.  The warrants are trading about 30 cents, right?

14    A.   Yes.

15    Q.   And the volume there is 23,200.

16    A.   March 30th or March 31st?

17    Q.   You can take either one.  The 31st.

18    A.   Okay.

19    Q.   The 31st, 99,000 Gerova warrants were traded on the

20    exchange.

21    A.   That's what it appears to me.

22    Q.   So if you were to try to price the warrants, you'd have to

23    take into account, among other things, the fact that it very

24    rarely happened that more than a couple ten thousands of these

25    warrants were actually sought to be purchased by buyers on the

1    market, right?

2    A.   In terms of pricing the warrants in connection with what?

3    Q.   Establishing their value.

4    A.   The value that was established for accounting reasons --

5    Q.   I wasn't asking about accounting reasons.

6    A.   -- are specific, so I can't answer about establishing a

7    value for an agreement.  That's a legal term.  I'm sorry.

8    Q.   Let's be very clear.  We walked through the language that

9    specifies how the parties agreed upon a value for the warrants,

10   right?

11   A.   Yes.

12   Q.   That was on page 1 of the agreement.

13   A.   Yes.

14   Q.   The questions that I've been asking you about the

15   Black-Scholes model are questions about how to establish the

16   value of the warrants generally, right?

17   A.   Not in this situation, in a general situation for other

18   companies at other times, yes.

19   Q.   Well, I'm not asking the accounting question yet.  There's

20   a separate issue as to how you would account for the expense

21   associated with purchasing or selling or issuing these

22   warrants, right?

23   A.   Yes.

24   Q.   Okay.  And that's something that you examined at some point

25   in time back in 2010, right?

1    A.   Yes.

2    Q.   But what I'm asking you, I'm asking you questions about

3    what these things are actually worth, how you would establish

4    the value of the warrants in the hands of someone who was in a

5    position to sell them or exercise them.  Understand?

6    A.   I understand your question, I'm not sure I can answer it.

7    Q.   Okay, fair enough.  But again, you are familiar generally

8    with the concept of Black-Scholes and the idea that there is a

9    formula for establishing value of these things in the hands of

10   a holder, right?

11   A.   I am aware that Black-Scholes is used when there is no

12   alternative method of valuing the security that's being given

13   to -- or exchanged in a transaction, yes.

14   Q.   Okay.  And you're aware also, going back to the warrant

15   agreement, please, you're aware that the warrant agreement is a

16   private agreement between parties, right?

17   A.   I do.

18   Q.   Mr. Shahini was not given publicly traded warrants by the

19   company, right?

20   A.   That's true.

21   Q.   He was given a private contractual right, correct?

22   A.   Yes.

23   Q.   Now, thinking about this from the perspective of the

24   company in realtime, the exchange of the warrants in place of

25   the $2.2 million cash obligation had advantages, did it?

1   A.   Yes, for the company, it did.

2   Q.   From the company's perspective it did, right?  And the

3   principal advantage is that the company didn't have to pay

4   $2.2 million in cash, right?

5   A.   Correct.

6   Q.   Instead, it was giving Mr. Shahini the right under certain

7   circumstances to purchase stock in the future, right?

8   A.   Yes.

9   Q.   And that was for a limited period of time, correct?

10  A.   I don't recall the period of time.  I think it was a two or

11  three-year period of time.

12  Q.   Let's turn to the second page of this document.  Directing

13  your attention, Mr. Hlavsa, to numbered paragraph 2, pretty

14  much in the middle of the page.  Could you read that out loud?

15  A.   Sure.  "This warrant shall expire on March 29th, 2013."

16  Q.   And it's issued on the 29th of 2010, correct?

17  A.   Yes.

18  Q.   So it's a three-year warrant?

19  A.   It's a three-year warrant.

20  Q.   So that means for a period of three years, Mr. Shahini,

21  depending on whatever analysis he thinks is appropriate, will

22  decide whether or not to exercise his warrants, right?

23  A.   Correct.

24  Q.   And they'll have some value to him if the stock is above

25  the strike price, right?

1   A.  Yes.

2   Q.  If the stock remains at or below the strike price, this

3   document is worth nothing, right?

4   A.  Yes.

5   Q.  From the company's perspective, none of that matters,

6   right?

7   A.  It matters in a dilutive way, obviously, because the more

8   shares that are issued by the company, the value of each share

9   is less based on its underlying assumptions.  So there is a

10  cost to the company in some terms.  It's not a direct cost by

11  paying cash, correct.

12  Q.  Right.  So again, from a cash management perspective, it's

13  a good deal for the company in 2010 because the company didn't

14  have any cash to speak of, right?

15  A.  That's correct.

16  Q.  Shahini's perspective is different, right, than the

17  company's?

18          MS. HECTOR:  Objection.

19          THE WITNESS:  I don't understand the question.

20          THE COURT:  Yes.  Sustained.  Rephrase.

21  Q.  I'm sorry.  The perspective of the counterparty in this

22  kind of an arrangement is different from the company's

23  perspective, right?

24          MS. HECTOR:  Objection.

25          MR. TREMONTE:  I'm not asking about Mr. Shahini's

 1   state of mind in particular, I'm asking about the mechanics of

 2   this kind of an arrangement.

 3          THE COURT:  Rephrase your question.

 4          MR. TREMONTE:  Yes.

 5   Q.  The risk analysis for the warrant holder in a situation

 6   where the company is issuing warrants in lieu of cash is

 7   different from the perspective of the company from a risk

 8   analysis; isn't that correct?

 9   A.  That's correct.

10   Q.  All right.  And that's because, from the perspective of the

11   holder, it might turn out that this is a good deal, but it

12   might turn out to be a pocket full of beans, right?

13   A.  Yes.

14   Q.  And that's not something that's under the control of the

15   warrant holder, right?

16   A.  Correct.

17   Q.  The from the warrant holder's perspective, he's hoping it's

18   more like Jack in the beanstalk than just a pocket of beans,

19   but that depends on how the company does, right?

20   A.  Yes.

21   Q.  On March 29th, 2010, when this warrant was issued, from the

22   holder's perspective, he has zero, right?

23          MS. HECTOR:  Objection.

24          THE COURT:  Sustained.

25          MR. TREMONTE:  I can rephrase, your Honor.

1    Q.  The value of the warrants as of March 29th, 2010 is

2    underwater, right?

3    A.  I do not know the price of the stock on March 29th, 2010.

4    Q.  If the price is below $7.50, then it's worth nothing,

5    right?

6    A.  That's correct.

7    Q.  So if the price on March 29th, 2010 was anything south of

8    the $7.50, Shahini has nothing, correct?

9    A.  Yes.

10              THE COURT:  Let me see you all at sidebar.

11              (Continued on next page)

1              (At sidebar)

2              THE COURT:  I fear that the last series of questions

3    and answers create a misleading impression.  The fact that

4    warrants are underwater does not mean they're worth zero.  They

5    may be extremely valuable.  They are warrants to purchase the

6    stock at a future point in time.  People pay enormous sums of

7    money for such warrants, even though at the moment they're

8    issued they're underwater.  The testimony elicited from this

9    witness is that they're worth zero, and that's just not true.

10             MR. TREMONTE:  Your Honor, I tried to lay a foundation

11   for this by eliciting testimony and presenting evidence as to

12   the price of the publicly traded warrants in realtime,

13   including as of the date that the warrant agreement was signed,

14   the volume of that trading on the relevant exchange, the

15   complexity of the analysis that is required to price warrants,

16   and by showing the witness the document itself and walking him

17   through the relevant provisions.  I think because that

18   foundation was laid, it is clear to the jury that when I say

19   it's worth zero, what that means is that, as of the date that

20   it was signed, it cannot be exercised for value.

21             THE COURT:  All right.  I'm going to give the

22   government some latitude on redirect on this point, but I'll

23   let everything stand.  Thank you.

24             (Continued on next page)

25

```
 1                     (In open court)

 2   BY MR. TREMONTE:

 3   Q.  Mr. Hlavsa, you testified yesterday about the compensation

 4   package that Mr. Manley received when he left the company in

 5   the spring of 2010, correct?

 6   A.  Yes.

 7   Q.  Mr. Manley, when he became CEO of the company, got a stock

 8   purchase agreement, correct?

 9   A.  Yes.

10   Q.  And under the terms of that stock purchase agreement, he

11   received the legal right to purchase up to $20 million worth of

12   the company's stock at $3.75 per share, right?

13   A.  I don't recall the terms -- the specific terms of the stock

14   purchase agreement.

15   Q.  Okay.  But he given the opportunity to purchase the company

16   stock, correct?

17   A.  I believe under -- yes, he was given the opportunity to

18   purchase company stock, correct.

19   Q.  He also, at the same time, became the CEO of the company,

20   right?

21   A.  Yes.

22   Q.  So from the company's perspective, the benefit of giving

23   Mr. Manley the ability to purchase those shares at a discount

24   is that he's going to be running the company and, therefore,

25   his interest will be aligned with the company, right?
```

```
 1              MS. HECTOR:  Objection.

 2              THE COURT:  I'll allow it.  Do you understand the

 3    question?

 4              THE WITNESS:  Yes, I do.  In general terms, that's the

 5    reason specifically why the senior officers of the company

 6    receive stock, so they have aligned interest.  I cannot answer

 7    specifically to Marshall Manley, I was not involved with that

 8    negotiation.

 9    Q.  You testified yesterday that you have a general

10    understanding of Reg S, correct?

11              MS. HECTOR:  Objection.

12              THE COURT:  Overruled.

13              THE WITNESS:  Yeah.  I'm not sure I would define

14    general, but I do know that there exists a Regulation S,

15    correct.

16    Q.  What's your understanding of Reg S?

17    A.  I believe it allows some flexibility with respect to

18    issuance of stock to those individuals who are not U.S.

19    citizens.

20    Q.  When stock is issued under this flexible rule to a non-U.S.

21    person, your understanding is that the stock is going to be

22    held in an overseas account, correct?

23              MS. HECTOR:  Objection.

24              THE COURT:  Sustained.

25    Q.  You understand that Reg S puts limitations on the people
```

 1    who get Reg S stock, right?

 2                MS. HECTOR:  Objection.

 3                THE COURT:  Overruled.

 4                THE WITNESS:  I do not know.

 5                MR. TREMONTE:  Can I have Government's Exhibit 201 in

 6    evidence, please?

 7    Q.  I'm going to show you what's been marked as Government's

 8    Exhibit 201 in evidence.  It's the Form 20-F.  I'm going to

 9    direct your attention -- do you see that?

10    A.  I do.

11    Q.  Do you recognize that document?

12    A.  I do.

13    Q.  I'm going to direct your attention in the first instance to

14    page 62 of that.

15                MR. TREMONTE:  If we can magnify it so we can see the

16    Section E "ownership" down at the bottom of the chart.

17    Q.  That's good?

18    A.  I see it.

19    Q.  You're familiar generally with this section of this form

20    that discusses share ownership?

21    A.  I am.

22    Q.  I think you testified yesterday to some extent about this

23    part of the disclosure, right?

24    A.  Yes.

25    Q.  Just beginning at the top, if you could read beginning

1   with, "the following table" down to the end of the bullet

2   points.

3   A.   "The following table sets forth information known to the

4   company regarding the beneficial ownership of the ordinary

5   shares as of May 24th, 2010 by it's:"

6            The first bullet point is, "Each person known by the

7   company to be the beneficial owner of more than 5 percent of

8   the ordinary shares," the second bullet point is, "Each of the

9   company's executive officers and directors," and the third

10  bullet point, "All executive officers or directors of the

11  company as a group."

12  Q.   That, in sum, is a description of who is going to be listed

13  in the chart, right?

14  A.   Yes.

15  Q.   So it's going to be anybody at all who has more than

16  5 percent of the outstanding shares, right?

17  A.   Yes.

18  Q.   It's also going to include each of the company's executive

19  officers and directors, irrespective of how much stock they

20  own, right?

21  A.   Yes.

22  Q.   Then all executive officers and directors as a group,

23  again, irrespective of how much stock they own, right?

24  A.   Yes.

25  Q.   So if we could turn to the next page.  I'm going to want to

```
 1   turn back.  See up there where it says number 2?

 2   A.  Yes.

 3   Q.  If you could just read that sentence.

 4   A.  "Based on approximately 133,004,000 ordinary shares

 5   currently outstanding."

 6   Q.  So that's the number of ordinary shares that were

 7   outstanding as of roughly the date that this document was filed

 8   with the SEC?

 9   A.  No.

10   Q.  So what was that number?

11   A.  I'm not sure what that number is.  This was the shares that

12   were disclosed at this time, the date of May 24th, which is in

13   the beginning of the schedule.

14   Q.  Okay.  So this accurately stated that as of May 24th, there

15   were 133,400,000 shares then outstanding, correct?

16   A.  That's what it states.

17   Q.  Okay.  We can go back.

18        Just based on this number, 133,400,000 you just

19   testified, 1 percent would be about 1.3 million shares, right?

20   A.  Yes.

21   Q.  And 5 percent would be about 6.7 million shares?

22   A.  That sounds about right, yes.

23   Q.  If the number were higher, if there were, in fact, more

24   outstanding shares, you'd have to have more shares to get to

25   5 percent, right?
```

 1    A.  Correct.

 2    Q.  So if there were more shares, then the 5 percent number

 3    would be greater than 6.6 million, right?

 4    A.  Yes.

 5    Q.  You see Gary Hirst is listed there on the fourth line?

 6    A.  I do.

 7    Q.  You see there's a little number 7 next to his name?

 8    A.  There is.

 9    Q.  And that indicates that there's additional information

10    about Mr. Hirst's holdings, correct?

11    A.  Yes.

12    Q.  If we could turn to that on the next page.

13            Now, again, you're familiar with all this, not least

14    of all because you were CFO of the company at the time that

15    this document was filed with the SEC, right?

16    A.  Yes.

17    Q.  And you testified yesterday that you were the person

18    ultimately responsible on the finance side for this document,

19    right?

20    A.  On the financial side, yes.

21    Q.  So turning to that note 7, do you see that?

22    A.  I do.

23    Q.  It gives additional information about how you get to the

24    total number that's listed on the previous page for Mr. Hirst,

25    right?

```
 1   A.  Yes.

 2   Q.  And on the fourth line it says "and the shares listed for

 3   Dr. Hirst also include 125,000 ordinary shares owned directly

 4   by Dr. Hirst", right?

 5   A.  Yes.

 6   Q.  So those are shares that he held directly, meaning himself

 7   in his own name.

 8   A.  Yes.

 9   Q.  And you also had shares that you directly held in your own

10   name; is that right?

11   A.  Correct.

12   Q.  Again, to be clear, just turning back to the chart on the

13   previous page, you agreed that to be listed on here, you have

14   to have either direct or beneficial ownership of at least

15   6.7 million shares, or you've got to be an executive officer of

16   Gerova, right?

17   A.  I don't see the word "direct".  It's -- it says "each

18   person by the company to be the beneficial owner".  Where is

19   "direct"?  I don't ask you the question, you ask me the

20   question.

21   Q.  That's right, but I stand corrected.  You don't have to be

22   the direct owner, you have to be the beneficial of at least 6.7

23   million shares or you just have to be an officer or director,

24   right?

25   A.  Correct.
```

1  Q.  And that's why you're on the list, even though you didn't

2  have more than 6.7 million shares, right?

3  A.  Correct.

4  Q.  Okay.  Now, Mr. Shahini received 5.3 million shares, right?

5  A.  He did.

6  Q.  And that's less than 5 percent by this calculation, right?

7  A.  Yes.

8  Q.  So he wouldn't be listed on this chart, right?

9  A.  That's correct.

10  Q.  I'm going to change topics and ask you some questions about

11  Gerova's bank accounts.  Okay?

12        There was an entity separate from Gerova that paid the

13  salaries of its U.S. employees, right?

14  A.  Yes.

15  Q.  That entity was called Gerova Management, right?

16  A.  That's correct.

17  Q.  And you were an authorized signatory on that Gerova

18  Management account in 2010, right?

19  A.  I was.

20  Q.  In fact, you were the only authorized signatory on the

21  account.

22  A.  I don't recall.

23  Q.  Now, you understand the concept of being an authorized

24  signatory, it's someone who has the authority to, for example,

25  sign checks, right?

```
 1   A.  Yes.

 2   Q.  Or effect wire transfers, right?

 3   A.  That's correct.

 4   Q.  Or perform other administrative tasks in connection with

 5   that account, right?

 6   A.  Yes.

 7   Q.  But you didn't own the funds in that account, in the Gerova

 8   Management bank account, right?

 9   A.  That's correct.  Personally, I did not own the funds.

10   Q.  Right.  So you couldn't use them for a personal reason,

11   correct?

12           THE COURT:  You mean properly use them or could you

13   use them?  Those are two different concepts.

14           MR. TREMONTE:  Let me clarify, your Honor.  Sorry

15   about that.

16   Q.  You could not properly avail yourself personally of the

17   funds in that bank account.

18   A.  Correct.

19   Q.  And you only moved those funds for legitimate company

20   purposes, right?

21   A.  Yes.

22   Q.  Gerova also had a bank account in Canada, correct?

23   A.  Yes, it did.

24   Q.  At a bank in Toronto?

25   A.  I believe so.
```

1  Q.  You were not a signatory on that Toronto bank account; is

2  that right?

3  A.  That's my recollection.

4  Q.  In fact, it was Keith Laslop who was the signatory on that

5  account?

6  A.  I believe so.

7  Q.  And you corresponded with Mr. Laslop from time to time

8  about that account?

9  A.  I did.

10  Q.  You told him when to wire funds and who to wire them to?

11  A.  I may have.

12  Q.  Actually, let me show you a document -- actually, two

13  documents to see if we can refresh your recollection on that

14  point.

15  A.  Sure.

16  Q.  I'm going to show you the documents that have been marked

17  for identification as Defendant's Exhibit 1200 and 1201.

18          MR. TREMONTE:  Your Honor, may I approach?

19          THE COURT:  You may.

20          MR. TREMONTE:  Different document.  Let me move on.

21  Q.  Mr. Laslop was the sole signatory on that account, correct?

22  A.  I do not recall.

23  Q.  And similar to the Gerova Management account, Mr. Laslop

24  could not properly avail himself of the funds in that account,

25  right?

1   A.   I believe that to be accurate.

2   Q.   I think yesterday you testified about Gerova's pre-SPAC

3   employees; is that correct?

4   A.   Yes.

5   Q.   I don't think you mentioned Mr. Laslop, but he was, in

6   fact, a pre-SPAC Gerova employee; isn't that right?

7   A.   He was a consultant to the company, he was not an employee.

8   Gerova really had no employees.  They had officers, nobody was

9   really an employee.  Keith was a consultant to the company,

10  yes.

11  Q.   And he was paid by the company pre-SPAC, right?

12  A.   Yes, he was.

13  Q.   All right.  Changing topics again.

14         You testified yesterday that you worked for two other

15  companies that were associated with Mr. Galanis in addition to

16  Gerova, right?

17  A.   Yes.

18  Q.   And those were Rineon and fun.com?

19  A.   Yes.

20  Q.   I think you testified that you worked for Rineon in or

21  about 2009; is that right?

22  A.   That's my recollection.

23  Q.   And I think you also testified that you initially were

24  presented with the fun.com opportunity in '07, but it didn't

25  ripen into anything concrete until later; is that right?

1    A.  That's correct.  My recollection is sometime in late 2007,

2    but nobody really started with fun.com and assumed their

3    responsibilities, I believe, until March of 2008.

4    Q.  At the same time that you were CFO of Gerova, you were also

5    CFO of fun.com, right?

6    A.  I was.

7    Q.  And you were additionally pursuing certain business

8    projects in Central America at that time, right?

9    A.  That's correct.

10   Q.  Central America and South America.

11   A.  Correct.

12   Q.  And in particular, you were involved actively in making

13   investments in Peru in '09 and '10, right?

14   A.  Yes.

15   Q.  And that was in connection with a company called Signature

16   Gaming, right?

17   A.  Yeah.  It was Signature Gaming Management FAC, which was a

18   Peruvian company.

19   Q.  And that's a company that you are the principal of.

20   A.  I was not.  I was a minority shareholder, I believe at one

21   point in time, but I certainly was involved with that company.

22   Q.  Right.  You were actively involved in trying to get certain

23   projects off the ground?

24   A.  That's correct.

25   Q.  And that began, that was during 2010.

1   A.   In 2010, the interaction with respect to that business

2   opportunity ceased.  So there were parts of 2010 that there was

3   more activity, and then at some point in time in 2010 that

4   opportunity ceased to exist.

5   Q.   But as late as late October and November of 2009, you were

6   very actively pursuing projects in Peru, correct?

7   A.   Yes.

8   Q.   And in 2010, also, you sent documents to individuals,

9   including Gary Hirst, about proposed Signature Gaming projects

10  in South America, right?

11  A.   That's correct.

12  Q.   So that's as late as October, November, 2010, right?

13  A.   I don't specifically recall the dates.

14  Q.   Okay.  Let me show you some documents that may refresh your

15  recollection.

16  A.   Sure.

17              (Continued on next page)

1          MR. TREMONTE:  So I have shown the witness the

2    documents marked 1239, 1240 and 1241 for identification.

3          THE COURT:  All right.

4    BY MR. TREMONTE:

5    Q.  Mr. Hlavsa, take a moment to look at those documents, if

6    you would.  Please don't read from them or refer to them out

7    loud.  And I am going to ask you if those documents refresh

8    your recollection as to the fact that you were pursuing

9    opportunities in Peru in 2010.

10   A.  I have reviewed the documents, and yes, as I stated

11   previously, in the beginning of 2010, that opportunity was

12   being pursued.

13   Q.  Now, you sought investments from people involved in Gerova

14   in these projects, correct?

15   A.  I did.

16   Q.  In late 2010, you sent to Gary Hirst, among others,

17   extensive documentation relating to a Peru sports and race

18   book, correct?

19   A.  I don't specifically recall.

20   Q.  I am going to show you what has been marked for

21   identification as Defense Exhibit 1202.

22          MS. HECTOR:  Could the question be repeated?

23          Did you say late 2010 or late 2009?

24          MR. TREMONTE:  2009.

25          I can ask the question again.

1          THE COURT:  If you would.

2    Q.  I have shown you what has been marked as Defense Exhibit

3    1202.  Again, please don't refer to or read out loud from the

4    document, but take a moment to review it and then I am going to

5    ask you a question.

6    A.  The entire document or just the cover page?

7    Q.  Why don't you look first at the cover page.

8          MS. HECTOR:  May I just object for a moment?

9          THE COURT:  Sure, you may.

10          MS. HECTOR:  I think the original question was 2010.

11   So I think this is improper refreshing because I don't think he

12   asked the witness do you remember in late 2009.

13          THE COURT:  So why don't you put that question and

14   maybe we will find out that the witness recalls.

15          Try again, Mr. Tremonte.

16          MR. TREMONTE:  Yes, your Honor.

17   A.  Can you repeat the question?

18   Q.  Yes.  The question is, does this document refresh your

19   recollection --

20          THE COURT:  This may be hypertechnical.

21          First ask the question and then we will go the route

22   of seeing whether something refreshes the recollection.

23          MR. TREMONTE:  Understood, your Honor.

24   Q.  I believe the question I posed before I put the document in

25   front of the witness was, isn't it true that in late 2009, you

1   circulated extensive documentation to Gary Hirst and others to

2   solicit interest in investments in your Peru gaming

3   opportunity?

4   A.  In late 2009, I did circulate documentation to Gary Hirst

5   and others with respect to a potential opportunity in Peru,

6   yes.

7   Q.  You have a definite recollection of that, correct?

8   A.  I do.

9   Q.  Then I don't think we need to refresh it.

10          You circulated among other things a business plan,

11  correct?

12  A.  I believe so.

13  Q.  Without going into the details of the document in front

14  of -- which again I don't want you to read from because it's

15  not in evidence, in fact, just turn it over if you would -- the

16  plan that you were pursuing in Peru involved, among other

17  things, something called the Arequipa Jockey Club Social Club,

18  right?

19  A.  That's correct.

20  Q.  And there were going to be physical buildings associated

21  with that, right?

22  A.  There was a physical building; we were leasing space inside

23  the social club, yes.

24  Q.  And that physical building included, among other things,

25  slot machines, right, there was a casino component?

```
 1   A.   It did not, but that was the opportunity.

 2   Q.   That was part of the plan?

 3   A.   Correct.

 4   Q.   Then there were long-term plans that had to do with

 5   establishing a race book down there, right?

 6   A.   Yes.

 7   Q.   And connecting that to gaming operations domestically in

 8   the United States?

 9   A.   In terms of race betting, yes.

10   Q.   You were working on this project at the same time that you

11   were CFO of both Fund.com and Gerova, right?

12   A.   Yes.

13            MS. HECTOR:  Objection.  Relevance.

14            THE COURT:  I will allow it.

15            Go ahead.

16   Q.   You solicited significant investment from Gary Hirst for

17   this project, right?

18   A.   I did certainly discuss this with him.  I don't believe the

19   investment came directly from Gary Hirst, but an entity that he

20   was associated with.

21   Q.   In fact, Mr. Hirst committed approximately $190,000 to that

22   project, if not more, right?

23   A.   I don't specifically recall the number, but that sounds

24   approximately correct.

25   Q.   Jason Galanis was also an investor in the project?
```

```
 1   A.  He was not.

 2   Q.  Arie Van Roon was an investor in the project?

 3   A.  He was not.

 4   Q.  You solicited both of them, isn't that right.

 5   A.  I don't recall soliciting Arie Van Roon.  I did solicit

 6   Jason Galanis.

 7   Q.  Ultimately you weren't able to move forward with that

 8   project because of something having to do with the siting of a

 9   casino near a church, is that right?

10   A.  There were some issues with respect to gaming regulations

11   of the approximate distance between that location and a school

12   or church, yes.

13   Q.  So it never came to anything, right?

14   A.  That was one of the specific opportunities.  There were

15   other opportunities that were grouped together, but that one in

16   particular was not able to be pursued at that time.  It

17   subsequently was reengineered by the architect and was able to

18   be developed.

19   Q.  Mr. Hirst never saw any benefit from that project, correct?

20   A.  He did not.

21   Q.  The money that went to your project from him just

22   disappeared, right?

23   A.  Well, it didn't disappear; it was used for the project,

24   yes.

25   Q.  He didn't get it back, right?
```

 1   A.  That's correct.

 2   Q.  That's not the only money that Mr. Hirst made available to

 3   you that he didn't get back from you, correct?

 4   A.  That's correct.

 5   Q.  In fact, he lent you money for personal legal expenses,

 6   correct?

 7   A.  That's correct.

 8   Q.  You didn't repay him those funds?

 9   A.  I have not repaid him those funds, correct.

10   Q.  Changing topics, you testified yesterday to some extent

11   about your role at Fund.com where you were the CFO.

12           Fund.com issued restricted stock periodically, isn't

13   that right?

14   A.  I do not recall.

15   Q.  Restricted stock generally bears a legend indicating that

16   the shares are restricted?

17   A.  It does.

18   Q.  And those legends can be removed if you have got the

19   appropriate legal opinion and paperwork, right?

20   A.  I believe that to be true.

21   Q.  You're familiar with an individual named Jared Galanis,

22   right?

23   A.  I am.

24   Q.  You're familiar with his law firm Sentinel Law Group?

25   A.  I am.

1  Q.  When you CFO of Fund.com, you recommended that Sentinel Law

2  Group advise the company on the removal of restrictive legends

3  on stock, isn't that correct?

4  A.  I do not recall that.

5  Q.  Let me show you the document marked Defense Exhibit 1236

6  for identification.  This document is not in evidence.

7          I would like you to have a look at that document.

8  Please don't read from it or refer to it.  When you're done, I

9  will just ask if that refreshes your recollection as to whether

10  or not you recommended Jared Galanis's firm to advise Fund.com

11  as to the removal of restrictive legends?

12  A.  While I do not recall this document, it indicates that I

13  made --

14          MS. HECTOR:  Objection.

15  Q.  The question is --

16          THE COURT:  Stricken.  Just listen to the question.

17  A.  Repeat the question, please.

18  Q.  The question is, do you have a refreshed or new

19  recollection as to whether or not you recommended Sentinel Law

20  Group to advise Fund.com, a company that you were CFO of, about

21  the removal of restrictive legends?

22  A.  Yes.

23  Q.  OK.  Isn't it true that Steve Weiss also thought that that

24  was a good idea?

25  A.  Yes.

1   Q.  I want you to put the document down.

2   A.  Yes.

3   Q.  All right.  And Steve Weiss -- I think you may have given

4   testimony about this yesterday.  If you have, I apologize for

5   the repetition.  Steve Weiss was at the law firm called Hodgson

6   Russ, correct?

7   A.  Yes.

8   Q.  And Hodgson Russ advised Gerova as its outside counsel?

9   A.  Yes, it did.

10  Q.  Hodgson Russ in fact also advised Fund.com as its outside

11  counsel?

12  A.  At some point in its existence it did.

13  Q.  Steve Weiss was the lead lawyer on that engagement,

14  correct?

15  A.  That's correct.

16  Q.  So you didn't think there was anything wrong with having

17  Jason Galanis's brother's law firm provide legal advice to

18  Fund.com, right?

19  A.  Correct.

20  Q.  Neither did Steve Weiss, right?

21  A.  Correct.

22          MS. HECTOR:  Objection.

23          THE COURT:  If you know.

24          Do you know whether Steve Weiss had any view on the

25  subject?

1          THE WITNESS:  I personally do not know.

2          THE COURT:  OK.  That's the answer then.

3   Q.  Yesterday you testified as to Jason Galanis's role at

4   Gerova, correct?

5   A.  Yes.

6   Q.  I think you testified that he was the financial engineer of

7   the firm, among other things?

8   A.  Yes.

9   Q.  He played the same role at Fund.com, isn't that right?

10  A.  That's correct, in my opinion.

11  Q.  He was sort of the architect, he had the original idea for

12  the company, even though he was not himself an officer or

13  director, right?

14  A.  I would agree with that.

15  Q.  And you saw nothing wrong with that?

16  A.  I did not.

17  Q.  And your recommendation to use the Sentinel law firm was

18  consistent with your understanding that this was all fine,

19  right?

20  A.  Yes.

21  Q.  I want to ask you some questions about the points of

22  intersection between Fund.com and Gerova.

23          When you first agreed to become involved in Fund.com

24  in '07, it wasn't really active, correct?

25  A.  That's correct.

```
 1   Q.  Again, this is Fund.com I am asking about, not Gerova,

 2   right?

 3              THE COURT:  Keep your voice up, please.

 4              MR. TREMONTE:  Yes, your Honor.

 5   Q.  And you didn't start working for Fund.com until '08

 6   formally, right?

 7   A.  Correct.

 8   Q.  But you kept apprised of plans and generally understood

 9   that at some point it might come to something, right?

10   A.  Yes.

11   Q.  And you were introduced to that opportunity by Jason

12   Galanis, right?

13   A.  That's correct.

14   Q.  And ultimately the CFO job that you got, that was through

15   Jason Galanis, right?

16   A.  Yes.

17   Q.  Now, in addition to you and Jason Galanis, there are others

18   who were involved in both Gerova and Fund.com, right?

19   A.  That's correct.

20   Q.  Several people in fact, right?

21   A.  I believe so.

22   Q.  Why don't I go through them.

23              So one of them was Arie Van Roon, right?  He was

24   director of both Fund.com and Gerova?

25   A.  I don't recall him being a director of Fund.com.
```

 1  Q.  He, in fact, controlled over half of the class B shares of

 2  the company, didn't he?

 3  A.  He did control the shares, but I don't believe he was a

 4  director.

 5  Q.  Joe Bianco was also involved in both, is that right?

 6  A.  That's correct.

 7  Q.  He was the CEO of Gerova for some period of time, right?

 8  A.  Yes.

 9  Q.  He was also the chairman of the board of Fund.com as of

10  September 2009, right?

11  A.  I'm not certain of the dates, but he was chairman of the

12  board at some point in time.

13  Q.  Lucas Mann was the cofounder and at some point chief

14  marketing officer of Fund.com, correct?

15  A.  Yes.

16  Q.  And Keith Laslop, he was a director of Fund.com, right?

17  A.  That's correct.

18  Q.  And he was paid director's fees at Fund.com, right?

19  A.  I don't recall.

20  Q.  He was also involved with Gerova, correct?

21  A.  He was.

22  Q.  And Steve Weiss, as we have established, was outside

23  counsel to both, correct?

24  A.  Yes.

25  Q.  And the companies intersected not just in personnel, but

1   also in business interest, isn't that right?

2   A.  I don't recall.

3   Q.  So in late 2009, Fund.com was negotiating to acquire

4   Weston, right?

5   A.  I don't recall when the negotiations were transpiring with

6   Fund.com, the dates of the negotiations.

7   Q.  You were CFO of Fund.com in late 2009, right?

8   A.  I was.

9   Q.  And you know that in November of 2009, Fund.com announced

10  its acquisition of an equity interest in Weston Capital

11  Management, right?

12  A.  I do not recall that.

13  Q.  Let me show you what has been marked for identification as

14  Defense Exhibit 1243.

15          Please have a look at that.  Don't read from it out

16  loud.

17          Does that document refresh your recollection as to

18  that announcement in November of 2009?

19  A.  Yes, it does.

20  Q.  Now you have a refreshed independent recollection of that

21  transaction in late 2009 by which Fund.com acquired Weston,

22  right?

23  A.  Yes.

24  Q.  Now, because there were so many overlapping individuals

25  between Fund.com and Gerova, it's fair to assume that the board

1    of directors of each company has a pretty good sense of what is

2    going on at the other company, right?

3              MS. HECTOR:  Objection.  Foundation.

4              THE COURT:  Sustained.

5    Q.  In addition to having the same law firm, isn't it true that

6    the accountants for Fund.com and Gerova were the same?

7    A.  At one point in time they were.  At that point in time, I

8    don't think they were.

9    Q.  Isn't it true that the auditors overlapped?

10   A.  I don't think they did, at that point in time.

11   Q.  So late 2009 you have got the Fund.com acquisition of

12   Weston, and in early 2010 you have got Gerova, the other

13   company that you're a CFO of, negotiating to buy the Wimbledon

14   assets from Weston, correct?

15   A.  Yes.

16   Q.  So both boards were actively dealing with Weston in late

17   2009, early 2010, right?

18   A.  I'm not sure the boards dealt with Weston, but certainly at

19   some point in time it was brought to each of the boards a

20   transaction involving Weston, yes.

21   Q.  Right.  So if you have got an announcement in November that

22   Fund.com is acquiring Weston, that announcement didn't get made

23   without the boards knowing about it, correct?

24   A.  Yes.

25   Q.  So that's November of 2009.

1          You know that Gerova closed on the Wimbledon assets in

2   January of 2010, correct?

3   A.  Yes.

4   Q.  So there was some period during which Gerova was

5   negotiating for that purchase that began in late 2010, right?

6   A.  I don't have any personal knowledge of the negotiations.

7   Q.  But again, to close on the Weston transaction in January,

8   there had to be at least a couple of weeks during which Gerova

9   was doing due diligence of the deal, right?

10          MS. HECTOR:  Objection.  Foundation.

11          THE COURT:  Sustained.

12          You can try and lay a foundation.

13  Q.  As the CFO of the company, you're familiar with the idea

14  that an acquisition is not going to take place without due

15  diligence, right?

16  A.  Which company are you referring to, or just in general?

17  Q.  Just in general.

18  A.  Typically an acquisition does involve due diligence, yes.

19  Q.  That due diligence involves acquiring a detailed

20  understanding of the nature and operations of the business,

21  correct?

22  A.  Typically, yes.

23  Q.  And the target is not going to be acquired without some

24  detailed understanding of its financial condition, right?

25  A.  Typically, yes.

1   Q.  And typically the finance part of the organization of a

2   company will be involved in evaluating the finances of the

3   target, right?

4   A.  Typically, yes.

5   Q.  So it's fair to assume, isn't it, that Gerova, during the

6   period that you were CFO, when you were evaluating the Weston

7   acquisition, performed due diligence on the financial condition

8   of the Wimbledon assets?

9   A.  No, I did not.

10  Q.  But it's fair to assume that the company did, correct?

11  A.  I'm not sure.  I have no personal knowledge if anybody else

12  in the company did.  I personally did not.

13  Q.  As you're sitting here today, you have no recollection as

14  to whether or not Weston, prior to the acquisition of the

15  Wimbledon assets, did any due diligence on the financial

16  condition of those assets?

17          MS. HECTOR:  I think the question accidentally said

18  Weston instead of Gerova.

19          MR. TREMONTE:  I can rephrase the question.

20          THE COURT:  Rephrase.

21  Q.  So it's your testimony that when you were CFO of Gerova, in

22  the weeks leading up to the acquisition of the Wimbledon

23  assets, you were unaware of any due diligence of the financial

24  condition of the Wimbledon assets?

25  A.  That's correct.

1   Q.  When that acquisition was announced, you as CFO had no idea

2   what the financial condition of the Wimbledon assets were?

3   A.  That's correct.

4   Q.  I would like to show you what has been marked for

5   identification as Defense Exhibit 800.

6          MR. TREMONTE:  Your Honor, Defense Exhibit 800 is the

7   subject of a stipulation that has not yet been read into

8   evidence, and that stipulation reflects an agreement between

9   the government and the defense as to the authenticity of the

10  document, not its admissibility.

11         I would propose that in the short-term we agree as to

12  its authenticity, subject to the stipulation being read, and I

13  will propose to introduce the exhibit into evidence.

14         THE COURT:  Is there a stipulation on authenticity?

15         MS. HECTOR:  There is a stipulation as to

16  authenticity.

17         THE COURT:  On Defendant's Exhibit 800?

18         MS. HECTOR:  Yes.

19         THE COURT:  Go ahead.

20  BY MR. TREMONTE:

21  Q.  Mr. Hlavsa, do you recognize this document?

22  A.  I do.

23  Q.  What do you recognize it to be?

24  A.  It's a Form 8-K filed by Fund.com on January 15, 2008.

25  Q.  If you could turn to the second page of the document.

1          I would like you to read down to the third full

2   paragraph on the page.

3          MR. TREMONTE:  Your Honor, may I approach?

4          THE COURT:  You may.

5          I thought you wanted to approach the witness, but you

6   may approach the judge, if you would like.

7          Ladies and gentlemen, you can stand up and stretch.

8   We are going to take a break in a few minutes.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. TREMONTE:  I don't want to run afoul of the

3     Court's rules so I didn't want to read from the document.

4          On page 2 of the document, Mr. Hlavsa is listed as the

5     CFO of Fund.com.  The document explains the circumstances of

6     the formation of that company, the circumstances of Mr. Hlavsa

7     becoming the CFO.  It also lists Ymer Shahini as a beneficial

8     owner of more than 5 percent of the shares of the company.  I

9     would like to move to have the document introduced into

10    evidence on that ground.

11         THE COURT:  Anybody have an extra copy for the judge?

12         MR. TREMONTE:  What I am showing the Court is the list

13    of beneficial owners.

14         MS. HECTOR:  On page?

15         MR. TREMONTE:  On page 19.  You will see it lists an

16    entity called Mulsanne, M-U-L-S-A-N-N-E.

17         (In open court)

18         THE COURT:  Ladies and gentlemen, we are going to take

19    our mid-morning break.  Do not discuss the case among

20    yourselves or with anyone.  We will be back in action in ten

21    minutes.

22         And you may step down after the jury exits.

23         (Jury exits courtroom)

24         MS. HECTOR:  I don't see page 19.  OK.

25         MR. TREMONTE:  It lists Mulsanne Enterprises Ltd. as

1    the beneficial owner of 5.7 percent.  Then there is a footnote

2    6.  And footnote 6 says that the name of the party who has the

3    power to vote and share power to dispose of the shares held by

4    Mulsanne Enterprises Ltd. is Ymer Shahini.

5            THE COURT:  Right.  And what?  I see that.

6            MR. TREMONTE:  So his testimony yesterday was that he

7    had never heard of --

8            THE COURT:  I think the witness is out of the room.

9            MR. TREMONTE:  The witness's testimony yesterday was

10   he had never heard of Ymer Shahini, and the government's theory

11   is that Mr. Shahini is unknown to anybody in the mix until May

12   of 2010.  This document -- we'd like to be able to argue from

13   it -- establishes that he is in fact not just in the mix, but

14   he is a controlling shareholder of a company that Mr. Hlavsa,

15   their main witness, is the CFO of.

16           MS. HECTOR:  I don't know if this document establishes

17   that he is a controlling shareholder.  It certainly suggests

18   that he is a shareholder, and so we have no objection to

19   relevance on that basis.  He can ask questions on that, in our

20   view.

21           MR. TREMONTE:  I offer it.

22           THE COURT:  Any objection to the document?

23           MS. HECTOR:  No.

24           MR. TREMONTE:  Thank you.

25           THE COURT:  We are on break.  See you in ten minutes.

1              One second.  I have a note from the jurors, but I am

2      going to ask you to mark it.

3              It reads:  "Note to judge.  Can you turn the air

4      conditioning down?  It's quite cold in the jury box, hence the

5      scarves, sweatshirts and jackets worn by us.  Thank you."

6              Will you please scan this and get this to building

7      management and Ed Friedland and let them know this is what I am

8      dealing with.  They have to comply.  They have to turn it down.

9              THE DEPUTY CLERK:  They will.  I am just going to

10     e-mail them.  That's how you do it.

11             THE COURT:  Thank you, Madam Deputy.

12             THE DEPUTY CLERK:  It's Court Exhibit 3.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
1              (Jury present)

2              THE COURT:  All right.  Please be seated.

3              Thank you, ladies and gentlemen, for the weather

4    report.  We are endeavoring to work on that and endeavoring to

5    keep you happy.  So one item of news.  We will not be sitting

6    tomorrow, to give you a chance to warm up.  So we will resume

7    on Monday.

8              And I have been in consultation with the lawyers and

9    the case is very much on track, maybe even slightly ahead of

10   schedule.  The trial will not go on forever, but it's important

11   that you pay close and careful attention to all of the evidence

12   in the case and to keep an open mind.

13             Mr. Tremonte, you may continue.

14             MR. TREMONTE:  Thank you, your Honor.

15   BY MR. TREMONTE:

16   Q.  Good afternoon again, Mr. Hlavsa.

17             I would like to show you the document that's in

18   evidence as Defense Exhibit 800.

19             THE COURT:  You have offered it.

20             MS. HECTOR:  No objection.

21             THE COURT:  It's received.

22             (Defendant's Exhibit 800 received in evidence)

23   Q.  Let's give that a second to come up on the screen.

24             Just to confirm, I believe it's now on your screen,

25   Mr. Hlavsa, this is the same document that I showed you before
```

1   the break, or at least the first page of a very large document

2   that I showed you before the break?

3   A.  I confirm.

4   Q.  Turning now to the second page of that document, and

5   directing your attention to the third full paragraph that

6   begins with the words "upon the closing of the merger."  Do you

7   see that?

8   A.  I do.

9   Q.  The second sentence of that paragraph, I believe it says,

10  "Following Mr. Rahman's resignation and pursuant to the

11  agreement, the directors of Fund -- Daniel Klass, Michael

12  Hlavsa, Lucas Mann and Darren Rennick -- became the directors

13  of the surviving corporation."  Right?

14  A.  Yes.

15  Q.  So as of the completion of this transaction you're the CFO

16  and the director of the company, right?

17  A.  That's correct.

18  Q.  And this company was formed by a reverse merger that's

19  described in some detail in this document, right?

20  A.  The company was formed and reversed merged into a public

21  company, yes.

22  Q.  And that public company was called Eastern Services

23  Holdings, right?

24  A.  That's my recollection.

25  Q.  That was an existing company in the gaming industry?

1   A.  No.

2   Q.  It's an existing company that you have had some familiarity

3   with?

4   A.  I did not.

5   Q.  But the idea of the reverse merger is you have got the

6   existing entity and Fund.com moves into that entity, right?

7   A.  Correct.

8   Q.  And then the name gets changed to Fund.com?

9   A.  That's correct.

10  Q.  Again, you're the CFO of that company, coming out as of

11  January 2010, right?

12  A.  I think it's January 2008.

13  Q.  I'm sorry.  January 2008.

14  A.  Right.

15  Q.  I am going to direct your attention to page 19 of the

16  document, which is coming up on the screen.

17          Directing your attention to the top of the page, you

18  see where it says, "Security ownership of certain beneficial

19  owners and management"?

20  A.  I do.

21  Q.  Just so there is no confusion, we looked at a similar chart

22  to this this morning, right?

23  A.  Yes, we did.

24  Q.  And that was a chart and a disclosure for Gerova, right?

25  A.  Yes.

1   Q.  This chart, by contrast, is a disclosure by Fund.com,

2   right?

3   A.  That's correct.

4   Q.  But the concept is similar, in that it's the disclosure

5   that tells the investing public who the beneficial owners of

6   the company's stock in excess of 5 percent are, right?

7   A.  Yes.

8   Q.  Again, same as before, it's not just the holders of more

9   than 5 percent, or the beneficial owners of more than 5

10  percent, it's also management, right?

11  A.  Correct.  All officers and directors.

12  Q.  And this piece of the disclosure, the section of the

13  disclosure, is important information for shareholders to know,

14  correct?

15  A.  Yes.

16  Q.  The chart lists the names of the beneficial owners on the

17  left, right?

18  A.  Yes.

19  Q.  And up at the top there are some individuals, Daniel Klass

20  and Lucas Mann.  Do you see that?

21  A.  I do.

22  Q.  Lower down there are entities, right?

23  A.  Yes.

24  Q.  And one of those entities is called Mulsanne Enterprises

25  Ltd.  Do you see that?

1   A.   I do.

2   Q.   That entity has ownership of 2.25 million shares of the

3   company's class A common stock, isn't that right?

4   A.   Yes, it does.

5             (Continued on next page)

1    BY MR. TREMONTE:

2    Q.  The percentage expressed in percentage terms, that's

3    5.7 percent of all outstanding shares, right?

4    A.  That's correct.

5    Q.  And there's a little number next to Mulsanne Enterprises,

6    Ltd.  Do you see a little 6?

7    A.  I do.

8    Q.  That suggests that there's further information about that

9    entity below, right?

10   A.  Yes, it does.

11   Q.  If you could turn the page to that paragraph?  Okay.

12   Directing your attention to numbered paragraph 6.  Can you read

13   the first sentence, please?

14   A.  "The name of the party who has the power to vote and share

15   power to dispose of the shares held by Mulsanne Enterprises,

16   Ltd. is Ymer Shahini."

17   Q.  So this is a 2008 filing, right?

18   A.  Yes.

19   Q.  Of a company that you just become CFO of, right?

20   A.  Correct.

21   Q.  And it lists Ymer Shahini as the person who has the power

22   to vote and share power to dispose of more than 5 percent of

23   that company's stock, right?

24   A.  Yes.

25   Q.  And that is disclosed to the investing public, right?

```
 1   A.  Yes.

 2   Q.  So anyone who bothered to read this section of the document

 3   would know that Ymer Shahini owns a big chunk of fun.com stock,

 4   correct?

 5   A.  Yes.

 6   Q.  All right.  Now, you were the incoming CFO of the company,

 7   right?

 8   A.  I was.

 9   Q.  You took that job seriously, right?

10   A.  Of course.

11   Q.  All right.  You acquainted yourself with this document at

12   or about the time it was filed, right?

13   A.  I cannot recall that.

14   Q.  I think you testified yesterday that from 2010, forward,

15   your position at Gerova became a full-time position, correct?

16   A.  Yes.

17   Q.  Now, it became a full-time position because after the

18   so-called de-SPAC, the company was up and running, correct?

19   A.  Yes, it was operational.

20   Q.  By that time, it was a going concern, right?

21   A.  Yes.

22   Q.  And there was much to be done, right?

23   A.  Yes.

24   Q.  I think you testified that you committed all of your time

25   to Gerova after that event in January, right?
```

```
 1    A.  I believe I said it was a full-time position, yes.

 2    Q.  Okay.  But you didn't commit, in fact, all of your time to

 3    fun.com at all, did you?

 4    A.  No, I did not.

 5    Q.  In fact, you were also committing your attention and time

 6    to an entirely separate public company, fun.com, right?

 7    A.  Yes.

 8    Q.  And you were also committing your time and attention to

 9    your projects in South America, right?

10    A.  That's correct.

11    Q.  And you did, in fact, travel to South America in connection

12    with those endeavors, didn't you?

13    A.  I did.

14    Q.  Do you know an individual named Julie Kean?

15    A.  I do.

16    Q.  Who do you know Julie Kean to be?

17    A.  She worked with Gary Hirst, I believe, as his

18    administrative assistant.

19    Q.  And you corresponded from time to time with Ms. Kean,

20    didn't you?

21    A.  I did.

22    Q.  After the de-SPAC, you shared with her the fact that you

23    were now on the payroll and getting paid regularly as the CFO

24    of Gerova; isn't that correct?

25    A.  I do not recall that.
```

1   Q.  Let me show you a document to see if it refreshes your

2   recollection.  I'm going to show you what's been marked for

3   identification as Defendant's Exhibit 1211.

4           Before I do that, you, in fact, expressed doubts to

5   Ms. Kean, didn't you, about your qualifications to serve as the

6   CFO of Gerova?

7           MS. HECTOR:  Objection, calls for hearsay.

8           THE WITNESS:  I don't recall that.

9           THE COURT:  I'll let the question and answer stand.

10  Q.  I'm going to show you now what's been marked for

11  identification as 1237, Defendant's Exhibit.  Have a look at

12  that.  Please don't read it out loud.

13  A.  Okay, I've read it.

14  Q.  Does that refresh your recollection as to your expressing

15  doubts to Ms. Kean about your fitness to serve --

16          MS. HECTOR:  Objection, your Honor.  May we have a

17  sidebar?

18          THE COURT:  Let's hear the rest of the question.  You

19  want to object to the question?

20          MS. HECTOR:  Yes.

21          THE COURT:  I need to hear the question in order to

22  understand the objection.

23          MS. HECTOR:  That's fine.

24          THE COURT:  Go ahead.

25          MR. TREMONTE:  Thank you, your Honor.

1    Q.  Does that refresh your recollection that you expressed

2    doubts to Ms. Kean about your qualifications to serve as CFO of

3    Gerova?

4              THE COURT:  I'll hear you at sidebar.

5              (Continued on next page)

1                (At sidebar)

2                THE COURT:  Yes.

3                MS. HECTOR:  Your Honor, this is my concern about this

4      question.  He's asking the witness whether this refreshes his

5      recollection that he expressed doubts to Ms. Kean about his

6      fitness to serve as -- or qualifications to serve as CFO, and

7      with the suggestion that this document states that.

8                He says to Ms. Kean, "Yup.  10-K a month during that

9      transition period until they find a more appropriate CFO."

10               MR. TREMONTE:  Then he says up here, "I really don't

11     know the insurance and hedge fund industry.  There should be

12     someone who can interact with potential target, wall street,

13     etc.  I'm not afraid of learning it, but it may not be my

14     career objective."

15               MS. HECTOR:  I just don't think that the question,

16     does this sort of refresh your recollection about you stating

17     that you didn't have appropriate qualifications, I don't think

18     that's what this document states.

19               THE COURT:  I think the witness has shown an ability

20     to handle himself on the stand.  I think there's always a

21     danger when you're asking about refreshing recollection if you

22     start quoting from the documents you're going to be in a

23     different puddle, so necessarily you have to characterize it,

24     so I'll allow it to stand.

25               In terms of the hearsay argument, the question really

1    isn't any different or much different than asking this man, "At

2    the time you became CFO, did you harbor doubts about your" --

3    you would not have a hearsay objection to that.

4              MS. HECTOR:  No.  It was the way it was phrased.

5              THE COURT:  I got it.

6              MR. TREMONTE:  Which I will ask.

7              THE COURT:  Right.  Okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  You may proceed.

 3   BY MR. TREMONTE:

 4   Q.  Mr. Hlavsa, does this document refresh your recollection?

 5   A.  Yes.

 6   Q.  At the time that you became CFO full time of Gerova, did

 7   you have doubts about your qualifications and preparedness to

 8   serve in that role?

 9   A.  Yes.

10   Q.  Changing topics, Mr. Hlavsa.  You testified yesterday about

11   the individuals who were the decision-makers before the de-SPAC

12   in early 2010, correct?

13   A.  Yes.

14   Q.  And you testified also that Angela Ho was one of the

15   founding individuals of the company before the de-SPAC, right?

16   A.  That's correct.

17   Q.  Originally, it was part of the plan originally, meaning at

18   the very begin of ASSAC, right, well before the de-SPAC, it was

19   part of the plan to leverage Angela Ho's contacts in business

20   generally, right?

21   A.  Yes.

22   Q.  And her father is a very well-known significant investor in

23   Macao gaming; isn't that correct?

24   A.  That's correct.

25   Q.  It was also anticipated, at least in principle, deals could
```

 1  be sourced through Ms. Ho and her father's extensive

 2  connections, right?

 3  A.  Yes.

 4  Q.  And there was an interest in pursuing such leads for the

 5  company, right?

 6  A.  Yes.

 7  Q.  Ms. Ho also put up resources in connection with the

 8  company's endeavors early on, right?

 9  A.  I believe she did.

10  Q.  All right.  So she was also an important decision-maker

11  before the de-SPAC, correct?

12  A.  Yes and no.  The reason I'm saying yes and no is that there

13  was a period of time prior to the de-SPAC that she was no

14  longer the chairman or director with the company.  I don't

15  recall specifically what time it was, but I don't believe she

16  was present on the board of directors during the de-SPACing

17  process.

18  Q.  So I'll ask a slightly different question.

19          Before she was relieved of those duties, she was a

20  decision-maker in the company, correct?

21  A.  Certainly, she was one of the decision-makers.

22  Q.  Changing topics again.  You testified yesterday about the

23  20-F that was filed on June 2nd, 2010?

24  A.  Yes.

25  Q.  You did not sign a certification for that document; is that

1    correct?

2    A.  I believe I did.

3    Q.  So you understood at that time that it was a requirement

4    for the CFO to sign a certification in connection with that

5    document?

6    A.  Yes.  As the principal accounting officer, I would have

7    signed the document.

8              MR. TREMONTE:  Your Honor, may I have a moment?

9              THE COURT:  You may.

10              (Pause)

11    BY MR. TREMONTE:

12    Q.  And you also signed a certification for the 20-F amended

13    that was filed on June 16th, correct?

14    A.  I did.

15    Q.  Turning now to the period January to March of 2010.  In

16    January, 2010, as you testified yesterday, Marshall Manley was

17    hired by Gerova as the CEO, correct?

18    A.  Yes.

19    Q.  And you testified yesterday about Government's Exhibit 241,

20    which is Manley's employment agreement, right?

21    A.  Yes.

22    Q.  All right.

23    A.  I believe so.

24    Q.  And at the same time, there was a share purchase agreement

25    entered into between the company and Mr. Manley, correct?

```
 1    A.  I believe so.

 2    Q.  Or to be precise, between the company and Mr. Manley and

 3    Marseille, an entity associated with him, right?

 4    A.  I believe so.

 5    Q.  That share purchase agreement contemplated the issuance of

 6    shares to Marseille Capital, correct?

 7    A.  I don't specifically recall, but I believe generally, yes.

 8    Q.  Let me show you Government's Exhibit 640 in evidence.  Is

 9    that document up in front of you?

10    A.  It is.

11    Q.  If you could turn to the next page.  Direct your attention

12    to the middle of the page under the word "Witnesseth", it says,

13    "Marseille wishes to purchase ordinary shares of capital

14    stock."

15    A.  I'm sorry.  Point to out where you're at.

16    Q.  Sure.

17    A.  I see it now.  The first whereas, the middle sentence.

18    Q.  Okay.  So that indicates that it was part of the

19    understanding that Marseille wanted to purchase shares, right?

20    A.  Yes.

21    Q.  Okay.  Turning to the next page, which is page 3 of the

22    document, the bottom half, "sale and purchase of subject

23    shares".  Do you see Section 2.1?

24    A.  Yes.

25    Q.  So that indicates that, "The company has agreed to sell to
```

1    Marseille 5.3 some million shares," right?

2    A.  Yes.

3    Q.  And then in the next it indicates that, "The price that is

4    going to be charged for those shares is $3.75," right?

5    A.  Yes.

6    Q.  So again, now that you've seen the document, isn't it true

7    that the share purchase agreement contemplates the issuance of

8    shares to Marseilles Capital?

9    A.  Yes.

10   Q.  And those shares were, in fact, issued to Marseilles

11   Capital, correct?

12   A.  I believe that to be true.

13   Q.  I'm going to show you Defendant's Exhibit 307.

14           MR. TREMONTE:  Actually, don't publish it to the jury

15   yet.  Your Honor, Defendant's Exhibit 307 is the subject of a

16   stipulation.  The parties have agreed that it should come into

17   evidence, but I don't believe that stipulation has been read.

18           THE COURT:  All right, so offer the document.  You're

19   offering Defendant's Exhibit --

20           MR. TREMONTE:  307.

21           THE COURT:  Any objection?

22           MS. HECTOR:  No objection.

23           THE COURT:  Received.

24           (Defendant's Exhibit 307 received in evidence)

25           MR. TREMONTE:  Thank you.  You can publish that to the

1    jury.  It's a multi-page document.  I can bring you a hard

2    copy, Mr. Hlavsa.

3    A.  Sure.

4    Q.  Do you see that this document is dated March 12th, 2010?

5    A.  I do.

6    Q.  It's on Gerova letterhead, correct?

7    A.  Yes.

8    Q.  This is a letter from Gerova, and it's addressed to

9    Continental Stock Transfer & Trust Company.  Do you see that?

10   A.  I do.

11   Q.  It states, "There are currently 7,906,456 ordinary shares

12   of Gerova Financial that are being held by you in an account

13   entitled "Deliveries for Contracts"."  Do you see that?

14   A.  Yes.

15   Q.  That's a statement of fact by Gerova that Continental has a

16   certain number of shares in a specific account, correct?

17   A.  Yes, appears that.

18   Q.  In the next sentence, this letter instructs and authorizes

19   you to transfer an aggregate of 6,891,000 of those shares to

20   the entities and in the denominations indicated in Schedule 1.

21   Do you see that?

22   A.  I do.

23   Q.  That basically says, of the 7.9 million, we want you to

24   distribute 6.8 million to specific people and entities, right?

25   A.  Yes.

1   Q.  And then the next sentence reads, "These previously issued

2   shared were previously registered but should now be transferred

3   as restricted shares."  Do you see that?

4   A.  I do.

5   Q.  That means that, whereas they didn't previously have a

6   restriction, now they're restricted, right?

7   A.  That appears to be true.

8   Q.  Then at the bottom of the page, you see there are two

9   signatures?

10  A.  Yes.

11  Q.  And one of those is yours, correct?

12  A.  That's correct.

13  Q.  Now, just to go through the rest of the body of the

14  document.  In the middle, the instruction states, "The shares

15  have been duly authorized and validly issued and are fully paid

16  and nonassessable."  Do you see that?

17  A.  Yes.

18  Q.  Again, that's a statement on the company's behalf to

19  Continental as to the condition of those shares, right?

20  A.  Yes.

21  Q.  That's not information that Continental would otherwise

22  have, right?

23  A.  I'm not sure.

24  Q.  Then it says, "The certificate shall bear the following

25  legend:" and then there's language in all caps, right?

1   A.   Yes.

2   Q.   And that's the legend that gets actually affixed to these

3   shares that will be transferred pursuant to this letter, right?

4   A.   Yes, that's the instruction.

5   Q.   Okay.  After that, it says, "Please update the share

6   register."  Do you have an understanding as to what the share

7   register is?

8   A.   Yes.

9   Q.   What's your understanding?

10   A.   It's the document that Continental maintains which

11   indicates the shareholders of the company.

12   Q.   Right.  And Continental doesn't just maintain one document,

13   right?  They typically maintain a range of information about

14   the company's shares, correct?

15   A.   Yes.

16   Q.   Going on with the sentence, "and issue the certificates

17   representing these shares," right?

18   A.   Yes.

19   Q.   So that's saying we at Gerova want you at Continental to

20   actually issue the certificates that bear these legends to

21   specified people, right?

22   A.   Yes.

23   Q.   And again, it refers to Schedule 1, which we'll turn to in

24   a minute, and then there's a note to get in touch with you or

25   Mr. Hirst if there's an issue, correct?

1    A.  I don't think it's both of us.  Well, it could be -- yeah,

2    "me", meaning both the signatories, yes.

3    Q.  If we could turn to the next page.  So this is a list of

4    entities and people who are going to be receiving certificates

5    pursuant to this instruction, correct?

6    A.  Yes.

7    Q.  And directing your attention down the column to the left

8    which lists the names, there's an entity called Marseilles

9    Capital, correct?

10   A.  I see it.

11   Q.  It lists the address for that entity?

12   A.  Yes.

13   Q.  And it lists the number of shares that it's going to get?

14   A.  Yes.

15   Q.  So that's the issuance that corresponds to the information

16   in the share purchase agreement that we were just looking at,

17   right?

18   A.  Yes.

19   Q.  So again, it's your understanding, pursuant to the

20   instruction that you gave together with Mr. Hirst, that

21   Continental was to transfer these shares to Marseille, right?

22   A.  Yes.

23   Q.  And by doing so, the company satisfied at least part of its

24   obligation to Mr. Manley and Marseille, correct?

25   A.  I would assume so, yes.

1   Q.  And that was given pursuant to a joint instruction from

2   Mr. Hirst and yourself.

3   A.  Correct.

4   Q.  Now, that issuance, and, in fact, other issuances on this

5   document, were ultimately ratified by the board of directors;

6   isn't that right?

7   A.  I don't specifically recall.

8   Q.  Let me show you what's in evidence as Government's

9   Exhibit 215.  Is Exhibit 215 up on your screen?

10  A.  It is.

11  Q.  This is a draft list of agenda items for a board meeting in

12  April of 2010, correct?

13  A.  Yes.

14  Q.  And that is a board meeting that was actually held; is that

15  right?

16  A.  I don't recall.

17  Q.  You're generally familiar with the idea of circulating

18  draft agenda items for board meetings?

19  A.  My recall is they usually would not indicate the watermark

20  of "draft" when they were circulated to the board members as

21  tentative items.

22  Q.  But they did get circulated, correct?

23  A.  Yes, they did.

24  Q.  The agenda items were frequently circulated in advance of

25  the meetings, right?

1    A.  Yes, they were.

2    Q.  And the purpose of that was to apprise the board members of

3    the issues to be addressed at the board meeting?

4    A.  Yes.

5    Q.  Directing your attention to item number 10.  Do you see it

6    says, "Ratification of the transfer of aggregate of 6,891,000

7    restricted ordinary shares."  Do you see that?

8    A.  I do.

9    Q.  That's the same number that's in the letter that your

10   signature was on from back in March, correct?

11   A.  Correct.

12   Q.  And it lists entities Stillwater, White Lion, Roth Capital,

13   Huntley Consulting, and Marseilles Capital, right?

14   A.  Yes.

15   Q.  And those are the entities that were on that letter that

16   you sent to Continental?

17   A.  I believe they're the same entities.

18   Q.  This draft contemplates board action to ratify those

19   issuances, right?

20   A.  That's correct.

21   Q.  But those issuances had not been approved in advance,

22   correct?

23   A.  By who?

24   Q.  By the -- well, by --

25   A.  Can you clarify?

1    Q.  By the board of directors.

2    A.  Those issuances have -- I don't know exactly whether a

3    component of those issues or the underlying agreements with

4    those issues were approved by the board of directors, as I

5    recall today.

6    Q.  Okay.  But there would be a difference, right, between

7    approving the underlying agreements and approving the issuance

8    of shares, correct?

9    A.  Yes.

10   Q.  All right.  So let me show you Government's Exhibit 106,

11   which I believe is also subject to a stipulation that has not

12   yet been made.

13          MR. TREMONTE:  I'm sorry.  I think it's Defendant's

14   Exhibit 106.  Are we agreed?  Your Honor, I'm going to offer

15   Defendant's Exhibit 106 into evidence.

16          MS. HECTOR:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 106 received in evidence)

19          MR. TREMONTE:  I'm going to bring a copy to the

20   witness.

21   BY MR. TREMONTE:

22   Q.  Mr. Hlavsa, I'm showing you Defendant's Exhibit 106 in

23   evidence.  You see at the top it says, "Asia Special Situation

24   Acquisition Corp."?

25   A.  Yes, I do.

1   Q.  And it says, "Written resolutions of the directors of the

2   company, January 15, 2010?"

3   A.  Yes, I do.

4   Q.  Directing your attention to the last page of this document,

5   if you turn it over, there's a signature page at the back.

6   A.  I see it.

7   Q.  And that's your signature?

8   A.  It is.

9   Q.  So you reviewed and approved these resolutions, correct?

10  A.  Yes, it appears so.

11  Q.  I want you to take the time to look at it, but there's

12  nothing in here about approving the issuance of shares to

13  Marshall Manley or Marseille, correct?

14  A.  Should I review it?

15  Q.  Please, do.

16          (Pause)

17  A.  I do not see anything that references the Marseilles

18  Capital share issuances.

19  Q.  Thank you.  I'm going to show you what's been marked as

20  Government's Exhibit 216 in evidence.  I'll bring you a copy of

21  that, as well.

22          Have you had a chance to look that over?

23  A.  No.  Would you like me to look it over?

24  Q.  Please, do.

25          (Pause)

 1    A.   I quickly reviewed it.

 2    Q.   Okay.  Do you see on the first page at the top it says,

 3    "Gerova Financial Group. Ltd. secretary certificate"?

 4    A.   Yes, I do.

 5    Q.   That's a certificate in your name, correct?

 6    A.   That's correct.

 7    Q.   And it says, "Attached hereto as Exhibit A are true,

 8    complete and correct copies of all the resolutions duly and

 9    validly adopted by the board at a meeting held on April 7th,

10    April 8th," right?

11    A.   Yes.

12    Q.   That board meeting, that's the same date as the draft

13    agenda items I showed you earlier, right?

14    A.   I believe the --

15    Q.   I think you have that document in your stack.  That's

16    Government's Exhibit 215.

17    A.   I believe you had it up on the screen.

18    Q.   I'll just hand you a copy.

19    A.   Okay.

20         MS. HECTOR:  I'm sorry.  Could you just repeat the

21    question?

22         MR. TREMONTE:  Yes.

23    Q.   Government's Exhibit 216, the list of resolutions

24    unanimously adopted at the April 7th board meeting, that

25    corresponds to the draft agenda, Government's Exhibit 215, of

1    that same board meeting, right?

2    A.  Exhibit 215 indicates the dates are April 6thth and 7th, so

3    there is a difference there, but they generally talk about the

4    same board meeting.

5    Q.  And that's all I wanted.  I didn't mean to suggest there

6    was --

7           THE COURT:  All right.  Ask the next question.

8           MR. TREMONTE:  All right.

9    Q.  There's nothing in Government's Exhibit 216 about the

10   ratification of issuance of shares to Marseilles Capital,

11   correct?

12   A.  There is nothing about ratification of shares.  There is a

13   resolution concerning Marseilles Capital, yes, but not -- it

14   does not include a ratification of those shares.

15   Q.  Right.  So the issuance of shares to Marseilles Capital was

16   not ratified at either the January or the April Gerova board

17   meeting, correct?

18   A.  Those board meetings, correct.

19   Q.  And there were no board meetings between January and April,

20   correct?

21   A.  I do not know.

22   Q.  Isn't it true that the issuance of shares to Marseilles

23   Capital were never ratified by the board of directors?

24   A.  I can't say for certain.

25   Q.  You testified yesterday that only Gary Hirst communicated

1  with Continental Stock Transfer; isn't that right?

2  A.  That's correct.

3  Q.  And yet the document that I showed you just a few minutes

4  ago, which is the March 12th, 2010 letter, Defendant's

5  Exhibit 307, shows that both you and Mr. Hirst together

6  communicated a share issuance instruction to Continental on

7  that date, correct?

8  A.  Yes.

9  Q.  Isn't it true that from time to time, Mr. Bianco alone

10  would issue instructions to Continental?

11  A.  I do not recall that.

12  Q.  Let me show you something to see if it refreshes your

13  recollection.  It's Defendant's Exhibit 1247 for

14  identification.

15  A.  Thank you.

16  Q.  Please don't read from the document, have a look at it and

17  let me know when you've read it.

18  A.  I've read it.

19  Q.  Does that refresh your recollection that Mr. Bianco would

20  independently communicate instructions to Continental Stock

21  Transfer?

22  A.  Yes.

23  Q.  And isn't it true that you alone from time to time would

24  communicate instructions to Continental Stock Transfer?

25  A.  I did communicate with them, yes.

1    Q.  So it's not true, is it, that only Gary Hirst indicated

2    instructions to Continental Stock Transfer.

3    A.  I can't answer that because I don't know specifically which

4    instructions you're referring to.

5    Q.  Well, isn't it true that you gave instructions to issue

6    shares of stock to Continental?

7    A.  My recall is I did not do that solely.

8    Q.  I'm going to show you what's been marked for identification

9    as Defendant's Exhibit 1246.  Please have a look at that, don't

10   read from it, and let us know when you're done.

11   A.  I'm done.

12   Q.  Okay.  Does that refresh your recollection that you would,

13   from time to time, alone authorize Continental to issue shares

14   of stock?

15   A.  I do not recall this document, but my signature is on it.

16          MS. HECTOR:  Objection.

17          THE COURT:  Yes.  Don't read from the document.

18   Q.  Okay, Mr. Hlavsa.

19   A.  Can you repeat the question?

20   Q.  Yes.  Of course.  Does reading that document refresh your

21   recollection that you authorized Continental Stock Transfer to

22   issue shares of stock?

23   A.  Yes.

24   Q.  Thank you.

25          Directing your attention now to May of 2010.  There

 1  came a time, didn't there, in May of 2010 when Mr. Hirst went

 2  on a family vacation; isn't that right?

 3  A.  I do not recall.

 4  Q.  Mr. Hirst had at that time a son in college in California;

 5  is that right?

 6          MS. HECTOR:  Objection, relevance.

 7          THE COURT:  Sustained.

 8  BY MR. TREMONTE:

 9  Q.  Directing your attention to June of 2010.  You testified

10  yesterday and earlier about the preparation of the Form 20-F

11  that was filed with the SEC on June 2nd, correct?

12  A.  I did.

13  Q.  That document was prepared, as it were, on a rush basis; is

14  that right?

15  A.  I do not recall it being prepared on a rush basis.

16  Q.  In fact, there was an instruction from Mr. Weiss that it be

17  done quickly, isn't that correct, sometime in mid-May?

18  A.  I do not recall.

19  Q.  Let me show you what's been marked for identification as

20  Defendant's Exhibit 1244.

21  A.  Okay, I've read this.

22  Q.  Mr. Hlavsa, let me do it this way.  Do you recognize this

23  document?

24  A.  I do, yes.

25  Q.  This is a document that you received --

 1              MS. HECTOR:  Objection.  I thought the question was

 2    refresh your recollection.

 3              MR. TREMONTE:  I'd like to offer the document, your

 4    Honor.  I'm trying to establish a foundation.

 5              THE COURT:  Go ahead.  Try and lay your foundation.

 6    Q.  It's a document that you received in May of 2010?

 7    A.  Yes.

 8    Q.  Okay.  And it's generally about the subject of the

 9    preparation of these financial filings?

10    A.  Yes.

11              MR. TREMONTE:  Your Honor, I offer the document in

12    evidence.

13              THE COURT:  Any objection to Defendant's 1244.

14              MS. HECTOR:  No, your Honor.

15              THE COURT:  Received.

16              (Defendant's Exhibit 1244 received in evidence)

17              MR. TREMONTE:  You can publish it to the jury.

18    BY MR. TREMONTE:

19    Q.  This is an email, you'll see at the top in the FROM line,

20    has your name, and you send it to someone named Puglisi and

21    Ken@riscica.com, correct?

22    A.  That's correct.

23    Q.  And that's the outside auditor and the outside accounting

24    consultant, right?

25    A.  Yes.

1   Q.  And the subject line is "Gerova 20-F", correct?

2   A.  Yes.

3   Q.  It says, "Joe and Ken."  That's how you're addressing these

4   people by their first names, right?

5   A.  Yes.

6   Q.  "I was told earlier this is not a rush, but now I get the

7   email from Steve."  Do you see that?

8   A.  I do.

9   Q.  Steve is Steve Weiss?

10  A.  I believe it to be.

11  Q.  So this reflects your understanding at that time that

12  preparation of the 20-F was not a rush, but now there's been

13  contrary instruction from Steve Weiss, right?

14  A.  It appears that way, yes.

15  Q.  And since you're working of necessity closely together with

16  Hodgson Russ to prepare these documents, it's relevant what

17  Steve's sense of the timing is, correct?

18  A.  Yes.

19  Q.  Then you say, "I've told everyone that I have two filings

20  to get done by Monday and then on to Gerova."  Do you see that?

21  A.  Yes.

22  Q.  So the fair inference from that is that the two filings

23  that you have to get done by Monday are for some other entity,

24  and then you're going to move on to Gerova's work, correct?

25  A.  I believe so.

1  Q.  And then you go on to identify some items that you need to

2  provide, and you're asking them for information about their

3  work in connection with this filing, right?

4  A.  Yes.

5  Q.  So again, this indicates that the preparation of the 20-F

6  at some point in mid-May became a matter of urgency, right?

7  A.  It appears that way, yes.

8  Q.  And that was equally true of the 20-F amended that was

9  filed not two weeks after the June 2nd 20-F, correct?

10  A.  I do not recall.

11  Q.  Nevertheless, it was prepared and submitted within 12 days

12  of the 20-F, right?

13  A.  That's factually correct.

14  Q.  And it is a document that runs into the hundreds of pages,

15  right?

16  A.  Yes.

17  Q.  And it requires the coordination of outside counsel and

18  accountants and auditors and other people, right?

19  A.  While it's a revised document it certainly requires

20  coordination of all those parties.

21  Q.  You testified earlier that you don't remember that Gary

22  Hirst was away on vacation, correct?

23  A.  That's correct.

24  Q.  Let me show you a document that may refresh your

25  recollection.  Let me show you Defendant's Exhibit 107 for

1   identification.

2           MR. TREMONTE:  Your Honor, my mistake.  This document

3   is in evidence subject to stipulation, so I offer it.

4           MS. HECTOR:  No objection.

5           THE COURT:  It's Defendant's Exhibit 107?

6           MR. TREMONTE:  That's correct.

7           THE COURT:  Received into evidence.

8           (Defendant's Exhibit 107 received in evidence)

9   BY MR. TREMONTE:

10  Q.  At the top of the document, you see it's an email,

11  Mr. Hlavsa?

12  A.  I do.

13  Q.  And it's from Keith Laslop sent on May 27th, 2010?

14  A.  Yes.

15  Q.  You see it's sent to a number of people, including

16  yourself, correct?

17  A.  That's correct.

18  Q.  And those other people are people who were likely to attend

19  the upcoming board meeting, correct?

20  A.  Yes.

21  Q.  And the document from Mr. Laslop says, "Dear directors.

22  The chairman of the board has authorized me to call a meeting

23  of the board of directors of Gerova for this Friday.  Sorry for

24  the late notice but the discussion is a very time-sensitive

25  matter."  Do you see that?

1    A.  I do.

2    Q.  Mr. Hirst at that time would send out these notices in

3    ordinary course, correct?

4    A.  Yes, he would.

5    Q.  But this email was sent by Mr. Laslop because he's filling

6    in for Mr. Hirst who is out of the office, right?

7              MS. HECTOR:  Objection, calls for speculation.

8              THE COURT:  If you know, sir.

9              THE WITNESS:  I do not know.

10             MR. TREMONTE:  I'd like to put up Defendant's

11   Exhibit 801 in evidence.  Sorry, it's also subject to

12   stipulation.  Let's put it up just without publishing.

13             Your Honor, Defendant's Exhibit 801 is in evidence

14   subject to stipulation.  I offer it into evidence.

15             THE COURT:  Any objection?

16             MS. HECTOR:  No objection, your Honor.

17             THE COURT:  Defendant's Exhibit 801 is received.

18             (Defendant's Exhibit 801 received in evidence)

19   BY MR. TREMONTE:

20   Q.  Do you see that this is an email from you dated June 13th,

21   2010 at 8:32 p.m.?

22   A.  I do.

23   Q.  It's addressed to Gary@axiat.com, correct?

24   A.  That's correct.

25   Q.  That's Mr. Hirst's email address, correct?

1    A.   Yes.

2    Q.   The subject line is "20-F financials and footnotes", right?

3    A.   Yes.

4    Q.   And there's an attachment to this email which is called

5    20Kfinancials123109final.., right?

6    A.   Yes.

7    Q.   And then in the body it says, "Gary.  Please see final

8    version.  On page F-16 it discloses 23.5M in transaction

9    costs."  That M is for millions, correct?

10   A.   That's correct.

11   Q.   "If you want to revise the language we will have to have

12   Ken review and Puglisi agree to changes."  Do you see that?

13   A.   Yes.

14   Q.   So you're saying in sum that if Mr. Hirst wants to revise

15   any part of the document that you're sending to him, it's going

16   to have to get run by the auditor and the consulting

17   accountant, right?

18   A.   No, not any part of the document, just those parts.  That

19   would be the responsibility of the independent auditor.

20   Q.   That would include the disclosure of information relating

21   to the expense associated with business combinations, correct?

22   A.   Yes.

23           MR. TREMONTE:  Your Honor, if I may have a moment.

24           THE COURT:  You may.

25           (Pause)

1          MR. TREMONTE:  Directing your attention to the

2     attachment, page F-16.  I've been told I have to wait a beat

3     before it registers for the jurors, as well.

4     Q.  On that page, F-16, directing your attention to the large

5     paragraph towards the middle of the page beginning, "In

6     connection with the acquisitions the company estimates."  Do

7     you see that?

8     A.  I do.

9     Q.  It lists 23,500,000 in costs directly attributable to the

10    Amalphis, Stillwater, and Wimbledon transactions.  Do you see

11    that?

12    A.  I do.

13    Q.  It says, "Approximately 10,400,000 of those costs will be

14    satisfied through the issuance of 1.391 million of the

15    company's ordinary shares."  Do you see that?

16    A.  I do.

17    Q.  That's what you just testified about.  That's the business

18    combination expense that is relevant for the purposes of your

19    email, correct?

20    A.  Correct.  I believe so.

21    Q.  All right.  So that cover email, again, was June 13th at

22    8:32 p.m.  Let me now show you Defendant's Exhibit 807, which I

23    believe is also subject to a stipulation.

24          MR. TREMONTE:  Your Honor, I would offer Defendant's

25    Exhibit 807 in evidence.

```
 1            THE COURT:  Any objection?

 2            MS. HECTOR:  No, your Honor.

 3            THE COURT:  Received.

 4            (Defendant's Exhibit 807 received in evidence)

 5  BY MR. TREMONTE:

 6  Q.  You see on this document, you've got your 8:32 p.m. email

 7  below, and then a new email above?  Do you see that?

 8  A.  I do.

 9  Q.  That's an email from Mr. Hirst to you at your

10  signaturegaming.com email address?

11  A.  Yes.

12  Q.  Just a quick question on that.  That's the email address

13  that you typically received communications at in connection

14  with your work at Gerova?

15  A.  It is not.  I typically received it at the Gerova email

16  address.

17  Q.  Okay.  But from time to time you would get communications

18  to your Signature Gaming, as well?

19  A.  Sometimes, yes.

20  Q.  This is again from Gary to you, right?  And this is about,

21  I don't know, an hour and 40 minutes after your email, correct?

22  A.  Yes.

23  Q.  It says, "I just want to make sure that the 23.5 million

24  includes the finder's fee for the Wimbledon transaction,"

25  right?
```

1    A.   Yes.

2    Q.   And there, he's just talking about Wimbledon.  We're not

3    talking about Stillwater, we're not talking about Amalphis, the

4    other business combinations listed in that paragraph we just

5    looked at, we're just talking about Wimbledon, right?

6    A.   It appears so, yes.

7    Q.   And then he says, "Probably does, but want to be sure!"  Do

8    you see that?

9    A.   Yes, I do.

10   Q.   The fair inference from that is he doesn't know one way or

11   another, but he is concerned that it's there?

12             MS. HECTOR:  Objection.

13             THE COURT:  Basis?

14             MS. HECTOR:  It's calling for speculation as to what

15   Gary Hirst meant by that statement.  I think the statement

16   speaks for itself.

17             THE COURT:  I don't know whether the question asks for

18   speculation, but rephrase the question.

19             MR. TREMONTE:  Yes, your Honor.

20   Q.   Directing your attention to the sentence, "It probably does

21   but want to be sure."  You formed an understanding as to what

22   Gary Hirst was trying to communicate to you by those words,

23   correct?

24   A.   Yes.

25   Q.   Your understanding was --

1        THE COURT:  What was your understanding?

2        THE WITNESS:  My understanding was whether or not the

3   fees associated with the Wimbledon transaction were included in

4   the $23.5 million number.

5   Q.  And down to the next sentence, "Can you send a list of what

6   compromises the 23 and a half million?  Or confirm that the

7   Wimbledon fee is included?"  Do you see that?

8   A.  Yes, I do.

9   Q.  All right.  What was your understanding as to what

10  Mr. Hirst wanted from you based on those two sentences?

11  A.  Either confirmation that the transaction fee was included

12  or actually a list of the specific items that made up the

13  $23.5 million.

14  Q.  I want to show you what's been marked for identification as

15  Defendant's Exhibit 802.  Mr. Hlavsa, this document is not in

16  evidence, so I'm going to ask you some questions about it.  I

17  don't want you to read from it, and neither am I.  Do you

18  recognize this document?

19  A.  I do.

20  Q.  What do you recognize it to be?

21  A.  A response to the previous email that Gary Hirst had sent

22  to me.

23  Q.  That's an email that you authored?

24  A.  It is.

25  Q.  It's an email that you transmitted?

 1    A.  It is.

 2              MR. TREMONTE:  Your Honor, I'd offer Defendant's

 3    Exhibit 802 into evidence.

 4              THE COURT:  Any objection.

 5              MS. HECTOR:  I think this is marked already as a

 6    government's exhibit, but no objection, because I don't know

 7    the number right now.

 8              THE COURT:  Defendant's Exhibit 802 is received.

 9              (Defendant's Exhibit 802 received in evidence)

10    BY MR. TREMONTE:

11    Q.  Mr. Hlavsa, this is now June 14th, the next day, 9:52 a.m.

12    It's an email from you to Gary; is that correct?

13    A.  That's correct.

14    Q.  The subject here is "Weston fees", right?

15    A.  Yes.

16              JURORS:  We lost it.  There we go.

17              THE COURT:  All right.  On that note, with visual

18    contact restored, we're going to break for lunch.

19              Ladies and gentlemen, do not discuss the case among

20    yourselves or with anyone, and we'll be back in action promptly

21    for 2:00.  Thank you.

22              (Jury not present)

23              THE COURT:  Have a pleasant lunch.  See you at 2:00.

24              (Luncheon recess)

25

```
1                        AFTERNOON SESSION

2                            2:00 p.m.

3            (Jury present)

4    MICHAEL HLAVSA, resumed.

5            THE COURT:  Good afternoon, ladies and gentlemen.

6    Please be seated.

7            We are back in action.

8            Mr. Tremonte, you may continue.

9            MR. TREMONTE:  Thank you, your Honor.

10           We can bring back up on the screen Defense Exhibit

11   802, please.

12   BY MR. TREMONTE:

13   Q.  Mr. Hlavsa, do you see Defense Exhibit 802 on your screen?

14   A.  I do.

15   Q.  That's a June 14, 2010 e-mail from you to Gary Hirst,

16   correct?

17   A.  Yes.

18   Q.  The subject there is Weston fees?

19   A.  Yes.

20   Q.  And that's sent at 9:52 a.m., correct?

21   A.  Correct.

22   Q.  The e-mail says, "Attached is pro forma with closing costs

23   identified."

24           Do you see that?

25   A.  I do.
```

1    Q.  What did you mean by "pro forma"?

2    A.  Pro forma is an accounting term for reporting a

3    transactional period with the adjustments as if a subsequent

4    event had occurred at the financial reporting date.

5           In this case, the de-SPACing transaction happened in

6    January of 2010.  The financial statements that we were

7    attaching were December 31, 2009.  So the pro forma would be to

8    reflect those financial statements as if the transaction had

9    happened in 2009.

10   Q.  Just to be very clear, the reporting period, the main

11   reporting period was '09?

12   A.  Correct.

13   Q.  And the information about the expenses associated with

14   business combinations, those are events that happened in '10?

15   A.  Correct.

16   Q.  And the next sentence here says, "There is no fee included

17   for Weston."  Right?

18   A.  Yes.

19   Q.  So that's you telling Gary that, whatever else may be in

20   there, the information about the expenses of the Wimbledon

21   transaction are not included?

22   A.  Correct.

23   Q.  And you used Weston and Wimbledon essentially

24   interchangeably, right?

25   A.  Yes.

1   Q.  You also indicated that you have not asked the accounting

2   side about this as yet, right?

3   A.  Yes.

4   Q.  Suggesting that you would once these issues were ironed

5   out, right?

6   A.  Yes.

7   Q.  And then you say, "We would need the agreement, which I

8   don't have, and then get buy-in from Riscica and Puglisi to

9   modify the 20-F."

10           Do you see that?

11  A.  Yes, I do.

12  Q.  When you say "modify the 20-F," again, you're in between

13  the 20-F and the 20-F/A, right?

14  A.  Yes.

15  Q.  In fact, you're two or three days away from filing the

16  20-F/A, right?

17  A.  From when it was filed, yes.

18  Q.  I think you testified yesterday, although it's dated the

19  16th, it could have been the 16th, it could have been the 17th,

20  but it's one or the other?

21  A.  Correct.

22  Q.  So whatever change you make you're going to have to run by

23  the auditor and the accounting consultant, right?

24  A.  That's correct.

25  Q.  I would like to direct your attention to the attachment.

1    And I note that the attachment is really mostly, if not

2    exclusively, text.  I think there's one or two tables in there,

3    is that right?

4    A.  I do not recall.

5    Q.  Let me give you a copy of the paper documents so you can

6    see it.

7           MR. TREMONTE:  Showing the witness a paper copy of

8    Defense Exhibit 802 in evidence.  It's the same document that's

9    on the screen.

10   A.  You had already provided it to me.

11          I see it.

12   Q.  The question was, it's mostly text, isn't it?

13   A.  Correct.  There are some tables, but it's primarily text.

14   Q.  I asked that really because I want to avoid confusion.

15          In other e-mails that you sent in this same time

16   period, when you were preparing the 20-F/A, you sent documents

17   to the accountants and auditors that you referred to as pro

18   formas, which are mostly numbers, right?

19   A.  I'm not sure.  I don't specifically recall.

20   Q.  In any event, this is mostly text, right?

21   A.  Yes.

22   Q.  I am going to direct your attention to a couple of pages

23   into the document, to the page that's marked at the bottom

24   5580.

25          You see up at the top it says, "Gerova Financial Ltd.,

1    Asia Special Situation Acquisition Corp., notes to unaudited

2    pro forma combined financial statements," correct?

3    A.  I do see that.

4    Q.  In 2010, at the time that you're e-mailing this document

5    around, you're no longer Asia Special Situation Acquisition

6    Corp., right?

7    A.  Correct.

8    Q.  You're now Gerova?

9    A.  Yes.

10   Q.  You're sending around documents that have been prepared in

11   connection with the financials for the previous year before the

12   de-SPAC, right?

13   A.  Yes.

14   Q.  So this page contains some notes, and I would direct your

15   attention down towards the bottom of the page to note, I think

16   it's M, as in Mary.

17   A.  I see it.

18   Q.  It says, "Reflects the 23.5 million in estimated costs

19   directly attributable to the Amalphis, Stillwater and Wimbledon

20   transactions."  Do you see that?

21   A.  Yes, I do.

22   Q.  Those are costs specifically, as it says here, relating to

23   attorneys, accountants and other advisers fees, right?

24   A.  Yes.

25   Q.  So any fee paid to an individual in connection with

1    introducing, say, the Wimbledon transaction, that would be

2    included in this amount, right?

3    A.  I would believe so, yes.

4    Q.  Then it says, "Of this amount, approximately 10.45 million

5    will be satisfied through the issuance of," and then it just

6    looks like a typo, it's a very large kind of incoherent number,

7    right?

8    A.  Yes.

9    Q.  So this is a document that's sort of a work in progress, is

10   that fair?

11   A.  I believe so.

12   Q.  Now I would like to turn to another document that you sent

13   it around the same time.  It's Government Exhibit 604 in

14   evidence.

15   A.  I see it.

16           MR. TREMONTE:  I am waiting for it to come up on the

17   jurors' screens.

18   Q.  So, Mr. Hlavsa, this is Government Exhibit 604.  Do you see

19   that?

20   A.  I do.

21   Q.  It's an e-mail from you, dated June 15, 2010, right?

22   A.  Yes, it is.

23   Q.  Now, this is an e-mail that you sent on the day after, the

24   next day after the one we were just looking at, correct?

25   A.  Yes.

1   Q.  You sent it at 11:36 a.m. to Joe Puglisi and Ken Riscica?

2   A.  Yes.

3   Q.  So, again, you're sending this to the outside auditor and

4   the outside accounting consultant, right?

5   A.  That's correct.

6   Q.  The subject line is "Weston commission agreement."

7           Again, Weston and Wimbledon are interchangeable,

8   right?

9   A.  Yes.

10  Q.  And the attachment to the document is called "Shahini final

11  012210.pdf," right?

12  A.  Yes.

13  Q.  And you said, "Joe and Ken, this is the agreement that

14  needs to be included in the transaction costs and will be

15  reflected in the MD&A in the 20-F."

16          Do you see that?

17  A.  I do.

18  Q.  When you wrote that, you were communicating your intention

19  that the auditor and the accountant understand that this

20  agreement needed to be accounted for, right?

21  A.  Yes.

22  Q.  Now, you reference an MD&A and the 20-F.  That's not

23  accurate, right?

24  A.  That's correct, it's not.

25  Q.  How is it not accurate?

1   A.  It's a domestic term, management discussion and analysis,

2   and that's not really the specific area of the 20-F that this

3   would have been disclosed.

4   Q.  So the 20-F doesn't have the MD&A section, it has some

5   other similar section, right?

6   A.  Correct.

7   Q.  So it's just a confusion about the terminology?

8   A.  Correct.

9   Q.  This e-mail attaches a document.  I would like to turn to

10  the first page of that attachment.

11          You see the consulting agreement, correct?

12  A.  Yes.

13  Q.  This is the Shahini consulting agreement that you testified

14  about both today and yesterday, right?

15  A.  Yes, it is.

16  Q.  And just so we are clear, this is the one from January

17  which commits the company to pay 2.2 million in cash to

18  Shahini, right?

19  A.  Yes, it does.

20          MR. TREMONTE:  If we could turn to the last page of

21  this document.

22  Q.  You see that there are signature lines on that page, right?

23  A.  Yes, I do.

24  Q.  But there are no signatures on that page, correct?

25  A.  Correct.

1    Q.  So you were sending around an unsigned version of this

2    document, right?

3    A.  Yes.

4    Q.  Now, you had received prior to sending this e-mail a signed

5    copy of the document, correct?

6    A.  I am not sure.

7    Q.  I think you testified that Mr. Weiss had provided you with

8    a signed copy of the document?

9    A.  I testified that Mr. Weiss provided me a copy of the

10   document.  I'm not certain whether it was signed or unsigned.

11   Q.  Prior to today, back in June of 2015, you gave testimony

12   before the SEC, correct?

13   A.  I did.

14   Q.  And you testified under oath at that proceeding, right?

15   A.  I did.

16   Q.  And you testified knowing that everything you said was

17   going to be written down, correct?

18   A.  Yes.

19   Q.  And you did your best to give accurate answers, right?

20   A.  Correct.

21   Q.  When you testified then, isn't it true you told the SEC

22   that you had received from Mr. Weiss, around this time in May

23   or June, a signed copy of the consulting agreement?

24   A.  I do not recall specifically testifying to that.

25   Q.  In any event, the document that you send around on this day

 1    is not the final signed copy, right?

 2    A.  That's correct.

 3    Q.  I would like to turn your attention now to the document

 4    marked Government Exhibit 604 in evidence.

 5            I'm sorry, 605 in evidence.

 6    A.  I see it.

 7    Q.  OK.  This is an e-mail from you, correct?

 8    A.  It is.

 9    Q.  Who is it to?

10    A.  Stephen Weiss.

11    Q.  What is the date and time?

12    A.  June 15, 1:07 p.m.

13    Q.  This is just shortly after the e-mail that we just looked

14    at, correct?

15    A.  Correct.

16    Q.  And this one has a subject line slightly different.  It

17    says "Weston agreement," right?

18    A.  Yes.

19    Q.  Same idea though, correct?

20    A.  Correct.

21            JUROR:  Are we supposed to see this document?

22            MR. TREMONTE:  Yes.

23            THE COURT:  There you go.

24    Q.  Again, for the jury's benefit, at the top of the document

25    it indicates it's an e-mail from you, dated June 15, 1:07 p.m.

1   It's to Stephen Weiss, the lawyer at Hodgson Russ, and it

2   references the Weston agreement, right?

3   A.  Yes.

4   Q.  And it attaches what looks like the same attachment that

5   you had earlier sent to the auditor and the accountants, right?

6   A.  I believe it does.

7   Q.  And that's the first page of the attachment, right?

8   A.  Yes.

9   Q.  And then going to the last page, you will see that this

10  version that you sent to Steve Weiss is also unsigned?

11  A.  Correct.

12  Q.  And turn back to the e-mail itself.  You send this document

13  to Steve Weiss, Stephen Weiss, without any comment at all,

14  correct?

15  A.  Yes.

16  Q.  Turning now to Government Exhibit 615 in evidence.

17  A.  I have it.

18          MR. TREMONTE:  I am just waiting for the image to come

19  up.  OK, great.

20  Q.  So I would like to direct your attention first to the

21  e-mail at the bottom of the page, which is the earliest in the

22  chain on this page.

23          It's an e-mail from you, is that correct?

24  A.  Yes.

25  Q.  What is the date and time?

 1   A.  Tuesday, June 15, 2010, at 3:09 p.m.

 2   Q.  It's to Gary Hirst, right?

 3   A.  Yes, it is.

 4   Q.  The subject is "revised language," right?

 5   A.  Yes.

 6   Q.  Can you read us through the first sentence of that?

 7   A.  "The company estimates that it has incurred approximately

 8   $23,500,000 in costs directly attributable to the business

 9   combinations relating to attorneys, accountants and other

10   advisers fees."

11   Q.  Now, that sentence hasn't changed from any of the previous

12   versions we have looked at, right?

13   A.  I don't believe it has.

14   Q.  It remains the same, the 20-F on June 2, the various

15   documents you send around on the 13th, 14th and now, it doesn't

16   change?

17   A.  I don't believe it does.

18   Q.  If you could read the next sentence, please.

19   A.  "Of this amount, approximately $10,400,000 million was

20   satisfied through the issuance of 1,391,667 ordinary shares and

21   certain private warrants."

22   Q.  Now, that sentence does change in this version for the

23   first time, correct?

24   A.  That's correct.

25   Q.  And it changes in two ways, right?

1   A.  I'm not certain in two ways, but yes.  Go ahead.

2   Q.  At least one of the earlier versions said "will be

3   satisfied," whereas this version says "was satisfied," right?

4   A.  I did not recall that.

5   Q.  And then it also adds the phrase "and certain private

6   warrants," right?

7   A.  Yes.

8   Q.  And it looks like the number of ordinary shares has

9   stabilized from that sort of messy number on the previous

10  draft?

11  A.  Yes.

12  Q.  The numbers don't change, neither the total amount of

13  expenses incurred, 23 million five, nor the 10,400,000 that was

14  satisfied through the issuance of securities, right?

15  A.  Correct.

16  Q.  But what does change is, whereas the earlier versions said

17  ordinary shares, here it says it's not just ordinary shares,

18  it's also private warrants, right?

19  A.  Yes.

20  Q.  Now, the consulting agreement that you sent around just a

21  little while earlier, that doesn't have anything to do with

22  warrants, correct?

23  A.  Correct.

24  Q.  That is just cash?

25  A.  Yes.

1    Q.  And the only document that we have looked at today that has

2    anything to do with private warrants is the private Shahini

3    warrant agreement, correct?

4    A.  Yes.

5    Q.  Let me ask you some questions about July 2010.

6            So we are done with May and June.  Now we are going to

7    turn to July.

8            In July, and I think also in August, you had a series

9    of communications with -- e-mail communications with

10   Continental Stock Transfer, isn't that right?

11   A.  I don't recall.

12   Q.  Let's take a look at Government Exhibit 318 -- DX 318, not

13   government exhibit, which I believe is in evidence.

14           MS. HECTOR:  It's not.

15           MR. TREMONTE:  Your Honor, I stand corrected.  DX 318

16   is not in evidence, but I offer it.

17           MS. HECTOR:  No objection.

18           THE COURT:  Received.

19           (Defendant's Exhibit 318 received in evidence)

20   Q.  Mr. Hlavsa, you see now that you have got Defendant's

21   Exhibit 318 in evidence on the screen in front of you?

22   A.  I do.

23   Q.  It's actually a two-page e-mail chain, but the second page

24   is just the spill-over and text from the bottom.

25           Turning back to the first page, directing your

1    attention to that e-mail at the bottom.  Do you see that?

2    A.  Yes.

3    Q.  That's from you, correct?

4    A.  Yes.

5    Q.  What is the date and who is it to?

6    A.  It's from me.  It's dated Wednesday, July 14, at 9:08 a.m.,

7    and it's to Shant Chalian and Eric Pinero.  Both of those

8    individuals were with Hodgson Russ.

9    Q.  So you're e-mailing the lawyers?

10   A.  Correct.

11   Q.  Two sort of junior lawyers, not Steve Weiss?

12   A.  Correct.

13   Q.  And you ask:  "Do you guys maintain the information on the

14   number of shareholders and how many shares are in the float?"

15   Right?

16   A.  Yes.

17   Q.  At the time, did you have an understanding as to the

18   difference between the number of shareholders and the number of

19   shares in the float?

20   A.  I did not.

21   Q.  Looking up to the next e-mail, do you see that?

22   A.  Yes.

23   Q.  One of the two Hodgson Russ lawyers responds to you,

24   correct?

25   A.  Yes.

1    Q.  That's Eric Pinero, on July 14, same day, just two minutes

2    later.  And what does he say?

3    A.  He says, "Not that I am aware of.  I can request number of

4    shareholders of record and shares issued and outstanding from

5    Continental.  Let me know."

6    Q.  And you responded to him, and brought Chalian back into the

7    e-mail, two minutes later.  If you can take us through that.

8    A.  My written text is:  "I already have this morning.  We

9    represent that there are 133.4 million shares outstanding.  I

10   just want to confirm and understand how many are restricted

11   shares (founders, Stillwater, Wimbledon)."

12   Q.  So you on the same morning have reached out to both the

13   lawyers and to Continental Stock Transfer for this information,

14   correct?

15   A.  Yes.

16   Q.  And the lawyers say, look, we don't have it, but just call

17   Continental, right?

18   A.  Yes.

19   Q.  I would like to take that down and now show you what has

20   been marked as Defense Exhibit 319.

21           MR. TREMONTE:  Which I will offer, I think without

22   objection, into evidence.

23           MS. HECTOR:  No objection.

24           THE COURT:  Received.

25           Document number.

1          MR. TREMONTE:  Defense Exhibit 318, your Honor.

2          THE COURT:  So received.

3          MR. TREMONTE:  Sorry.  319.  I apologize.

4          THE COURT:  318 stricken.  319 received.

5          (Defendant's Exhibit 319 received in evidence)

6     Q.  Mr. Hlavsa, do you see Defense Exhibit 319?

7     A.  I do.

8     Q.  Let's look first at the bottom e-mail.

9          It's from Lou Hensley.  Who is that?

10    A.  Lou Hensley was the chief executive officer of our

11    wholly-owned insurance division.

12    Q.  It says he is attaching an LOI.  What is an LOI?

13    A.  LOI is abbreviation for letter of intent.

14    Q.  As you sit here today, do you recall what this LOI was that

15    was going to get sent to Scottish?

16    A.  I do not.

17    Q.  And that e-mail was sent to, among other people, you,

18    correct?

19    A.  Yes.

20    Q.  On July 13.

21         Scrolling up, you respond, on the 14th, at 9:43 a.m.

22    And you say, "Lou, this is fine.  I am confirming the shares

23    outstanding with Continental (our transfer agent) and have not

24    heard back as yet, but the 133 million is fine."  Right?

25    A.  Yes.

1    Q.  It sounds like you're referring to a number that is

2    reflected in the LOI, is that fair?

3    A.  Yes.

4    Q.  And what you're saying essentially is, look, I am going to

5    get confirmation from the transfer agent, they have that

6    information, but for your purposes, you're OK with the 133?

7    A.  Yes.

8         MR. TREMONTE:  All right.  You can take that down.

9    Q.  I want to show you Defense Exhibit 320.

10        MR. TREMONTE:  Your Honor, Defense Exhibit 320 is not

11   in evidence.  I offer it.

12        MS. HECTOR:  No objection.

13        THE COURT:  Received.

14        (Defendant's Exhibit 320 received in evidence)

15   Q.  Mr. Hlavsa, do you see Defense Exhibit 320?

16   A.  I do.

17   Q.  At the bottom there is an e-mail from Vivina Mendez at

18   Continentalstock.com, Wednesday, July 14, 2010, at 10:00 a.m.

19   It's to you alone.  It says, "Re: Gerova shareholders."

20        Do you see that?

21   A.  Correct.

22   Q.  What is the information that she is sending you there?

23   A.  She indicates the number of shareholders for common, units,

24   warrants, and new warrant holders.

25   Q.  Scrolling up to the top of the page, you respond about 54

1   minutes later, and you say, "Vivina, my mistake.  I am looking

2   for number of shares, not shareholders."

3          What did you mean by that?

4   A.  She had given me the individuals of the companies that

5   owned the shares.  What I was looking for were the number of

6   shares that were outstanding, not the shareholders.

7   Q.  And you're asking her if she can get that for you, and you

8   want to know how many are restricted, right?

9   A.  Yes.

10  Q.  And restricted, as distinct from not restricted, right?

11  A.  Correct.

12  Q.  And you anticipated that Continental Stock Transfer would

13  have that information available to you?

14  A.  Yes.

15          MR. TREMONTE:  We can take down Defense Exhibit 320

16  and put up Defense Exhibit 322.

17          It's not in evidence, your Honor.  I offer it.

18          MS. HECTOR:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 322 received in evidence)

21  Q.  In the meantime, why don't I bring you a hard copy of

22  Defense Exhibit 322 in evidence.

23          MR. TREMONTE:  Your Honor, I am just going to open up

24  the elmo.

25          THE COURT:  Jurors, do you have it?

1        Now you have it.  OK.

2  Q.  Mr. Hlavsa, you see there's two e-mails in the chain.

3  Let's look first at the one at the bottom.

4        It's from Ms. Mendez at Continentalstock.com, dated

5  Wednesday, July 14, at 1:14 p.m.  It looks like this is a

6  follow-up on the prior e-mail, correct?

7  A.  Yes, it does.

8  Q.  What is she saying there?

9  A.  She is saying, "The issued and outstanding for the common

10  shares is below issued:  141,071, 601.  Treasury:  4,304,647."

11        So the issued and outstanding was 136,766,954.

12  Q.  Then she says, it looks like she can get you the number of

13  restricted shares, but she has got to run a report?

14  A.  Correct.

15  Q.  So that suggests she has the information, just not in a

16  form yet that she can share?

17  A.  I agree.

18  Q.  It lists here issued and Treasury shares.

19        What are Treasury shares?

20  A.  Treasury shares are the shares that are held by the

21  company.

22  Q.  Those are not outstanding for the purposes of this

23  calculation?

24  A.  Correct.  The public does not have them, the company has

25  them.

1    Q.  Let's scroll up.

2          Now, this is from you to Mr. Hensley, maybe half an

3    hour, 27 minutes later.

4          It looks like you are sending him this information as

5    a follow-up to his e-mail about the LOI?

6    A.  Correct.

7    Q.  So you're closing the loop.  You had given him one number,

8    this number is a little different, and you wanted him to know

9    the difference, right?

10   A.  That's correct.

11         MR. TREMONTE:  Let's take that down and bring up

12   Defense Exhibit 323.

13         Your Honor, I offer Defense Exhibit 323 in evidence.

14         MS. HECTOR:  No objection.

15         THE COURT:  Received.

16         (Defendant's Exhibit 323 received in evidence)

17   Q.  We have seen the bottom e-mail.  So just focusing on the

18   top, again on July 14, from you to Ms. Mendez.

19         You say, "Please run the report," right?

20   A.  Yes.

21   Q.  And that's the report that you referred to in an earlier

22   e-mail, right?

23   A.  Correct.

24   Q.  Then you ask, "Can I have the shareholder listing for each

25   month in 2010?"  Correct?

1    A.  Yes, I do.

2    Q.  And you wanted that so you could see the shares as they are

3    issued and canceled, right?

4    A.  Correct.

5    Q.  And that means you wanted to be able to see in

6    chronological order when shares were issued by the company to

7    third parties, right?

8    A.  I believe so.

9    Q.  And when outstanding shares were canceled by the company,

10   right?

11   A.  I believe so.

12   Q.  And to cancel shares means to sort of take them back into

13   possession and cancel them out entirely or to bring them into

14   Treasury?

15   A.  Cancel them would mean take them out of circulation

16   entirely.

17   Q.  Again, here, this is information that you anticipated

18   Continental Stock Transfer would make available to you upon

19   request, right?

20   A.  Yes.

21           MR. TREMONTE:  Let's take that down and move to

22   Defense Exhibit 324.

23           Your Honor, I offer Defense Exhibit 324 in evidence.

24           THE COURT:  Any objection?

25           MS. HECTOR:  No objection.

 1                THE COURT:  Received.

 2                (Defendant's Exhibit 324 received in evidence)

 3    Q.  Defense Exhibit 324 is on your screen, correct?

 4    A.  Yes, it is.

 5    Q.  It's two e-mails again.  Let's look at the bottom one.

 6                If you can take us through that.  It's from Ms. Mendez

 7    to you, right?

 8    A.  Correct.

 9    Q.  The date?

10    A.  July 15, 11:45 a.m.

11    Q.  It is cc'd to Alexandra Albrecht.  Who is that?

12    A.  Another individual at Continental Stock.

13    Q.  If you could read the text for us.

14    A.  "Hi, Michael.  We do not have anyone set up to receive the

15    month end reports for Gerova.  However, I will inform the

16    department who handles these requests to include you as the

17    receiver of the reports going forward.  I will have the

18    shareholder lists as of January through June generated and sent

19    to you.  I will also generate a report that shows the number of

20    restricted shares.  I'm sure you are aware that there is a fee

21    for the reports."

22                Do you want me to continue?

23    Q.  I think that's good for now.

24                So you tell me if this is right.  It sounds like you

25    can automatically receive month end reports for Gerova from

1    Continental if you're set up for that, right?

2    A.  That's what it sounds like, yes.

3    Q.  But at this time you weren't set up for that and that's why

4    you had to request to have them sent to you, correct?

5    A.  Yes.

6    Q.  It looks like for Fund.com, the other company you were CFO

7    for, that company was getting the automatic month end reports,

8    right?

9    A.  It appears that way.

10   Q.  Who is Greg Webster?

11   A.  Greg Webster was the chief executive officer of Fund.com.

12   Q.  Who is Phil Gentile?

13   A.  Phil Gentile I believe at one time was the chief operating

14   officer.

15   Q.  And Ms. Mendez also confirms that she is going to get you

16   the monthly shareholder list you asked for, right?

17   A.  Yes.

18   Q.  We can look briefly at the top, but I think you just

19   thanked them for the information.

20   A.  Yes.

21          MR. TREMONTE:  We can take that down.

22   Q.  I would like to show you what has been marked as DX 329.

23          MR. TREMONTE:  It's Government Exhibit 607 in

24   evidence.  So why don't we just use that.

25   A.  I have it.

1    Q.  This is Government Exhibit 607 in evidence.  Do you see

2    that?

3    A.  I do.

4    Q.  It's a string of e-mails.  Let's go to the first in the

5    string.

6              So the first e-mail in the chain is a little earlier

7    in July.  It's July 9.  It's from Shant Chalian.  That's one of

8    the lawyers at Hodgson Russ, right?

9    A.  Yes.

10   Q.  And he sends it to a number of people, including yourself,

11   right?

12   A.  Yes.

13   Q.  Also Joe Bianco, who is the CEO, and the outside auditor

14   and accountants, right?

15   A.  Yes.

16   Q.  It references something called a resale registration

17   statement.  Do you see that?

18   A.  Yes.

19   Q.  What is a resale registration statement?

20   A.  It's a statement that we were filing to register the

21   shares.  They were issued in connection with the de-SPACing.

22   Q.  Those were the Stillwater shares in particular, correct?

23   A.  Yes.  That was one of the parties, certainly.

24   Q.  Just so we have a background here, the Stillwater shares

25   were acquired pursuant to a written agreement, right?

1    A.   Yes.

2    Q.   Back in January of 2010, correct?

3    A.   Correct.

4    Q.   And that agreement contemplated that eventually shares

5    would be issued to the folks on the Stillwater side, right?

6    A.   Yes.

7    Q.   Shares of Gerova, to be precise?

8    A.   Yes.

9    Q.   So part of what this registration statement is doing, and

10   maybe the majority of what it's doing, is laying the SEC filing

11   groundwork for carrying out on that promise, right?

12   A.   Yes.

13   Q.   And it's coming from Chalian over at Hodgson Russ because

14   ordinarily the lawyers do the bulk of the drafting, at least

15   initially, on these things, correct?

16   A.   Correct.

17   Q.   It's not unusual that you would get this early draft from

18   them, right?

19   A.   Correct.

20   Q.   It looks like, without going through all of the text,

21   Chalian is giving you some information about the current status

22   of this draft, right?

23   A.   It appears that way.

24   Q.   Let's scroll up to the July 23, 11:09 a.m. e-mail.

25            A couple of e-mails up you have got another similar

1    e-mail from Shant Chalian, but now two weeks later on July 23.

2    Do you see that?

3    A.  Yes.

4    Q.  And most of the same recipients.  The CEO, right?

5    A.  Yes.

6    Q.  Steve Weiss, who is the senior partner over at Hodgson

7    Russ, gets it?

8    A.  Yes, he does.

9    Q.  And Jason Galanis gets it?

10   A.  Yes.

11   Q.  By the way, that's Jason Galanis's e-mail, right,

12   Jason@holmbycompanies.com?

13   A.  It is.

14   Q.  And you received a copy, right?

15   A.  Yes.

16   Q.  So it looks like he is telling you that he is going to

17   circulate an updated draft of the F-1, right?

18   A.  Yes.

19   Q.  Now, there were any number of drafts of this F-1 financial

20   statement circulated in 2010, correct?

21   A.  Yes.

22   Q.  In fact, there were also drafts circulated in 2011, right?

23   A.  That's correct.

24   Q.  But no F-1 was ever filed by the company, right?

25   A.  Not to my knowledge.

1  Q.  So to your knowledge, you had draft after draft, but

2  nothing ever got put up on the SEC's Web site?

3  A.  Correct.

4  Q.  The investing public never saw any of these drafts, right?

5  A.  I believe so.

6  Q.  So let's go up to the next e-mail, July 23, 2010.

7       So now you say -- I'm sorry.  This is a July 23, 2010

8  e-mail from you, right?

9  A.  Yes.

10  Q.  It's to Shant Chalian and others, right?

11  A.  Yes.

12  Q.  Again, it relates to the F-1, the draft F-1, right?

13  A.  That's correct.

14  Q.  What do you say there?

15  A.  It says, "Per the June 30 shareholders report, there were

16  141,071,601 in common, 22,036 in units, and 28,680,928 in

17  warrants."

18  Q.  Let's just go through those.  Let's just take these one by

19  one.

20       141 million or so in common, that refers to

21  outstanding shares of common stock, correct?

22  A.  Yes.

23  Q.  Does that include both restricted and not restricted?

24  A.  It looks like it might.  I'm not sure.

25  Q.  How about Treasury?

1   A.   I think it would include Treasury.

2   Q.   Next, it refers to units.  What are units?

3   A.   Units are a combination of one share of stock and one

4   warrant.

5   Q.   Both the common and the units are things that Continental

6   keeps track of, right?

7   A.   Yes.

8   Q.   Then it refers to these warrants.  Continental keeps track

9   of that too, correct?

10  A.   Correct.

11  Q.   They keep track of publicly traded warrants, right?

12  A.   Yes.

13  Q.   If something is the subject of a private warrant agreement,

14  it's not necessarily going to show up on the Continental

15  report?

16  A.   That's correct.

17  Q.   Let's go to the next e-mail.

18       I'm sorry.  Let's go to the top.  2:18 on July 23.

19  A.   I see it.

20  Q.   That's from you to Shant Chalian, Friday, July 23, 2010, at

21  2:18 p.m.?

22  A.   Correct.

23  Q.   The same subject.  You're still talking about the F-1,

24  right?

25  A.   Yes, we are.

1   Q.   What do you say there?

2   A.   "I am supposed to get a restricted share report today from

3   Continental as of June 30th.  Typically, the Cede are those in

4   street name and therefore tradeable.  However, there may be

5   more not held in street name."

6   Q.   Taking those sentences in turn.

7        First you're talking about a share report that

8   Continental is preparing for you as of the end of the previous

9   month, right?

10  A.   It appears that way.

11  Q.   How about that next sentence?

12  A.   "Typically, the Cede are those in street name and therefore

13  tradeable.  However, there may be more not held in street

14  name."

15  Q.   What are you getting at there?

16  A.   The shares that are electronic are listed as a single

17  shareholder on the shareholder report under the name Cede, and

18  the company doesn't know who the owners of those shares are.

19  They are just in electronic form.

20  Q.   But they are held by somebody in the Cede category; the

21  number shows up, but not the name, right?

22  A.   Correct.  And they are fully tradeable.

23  Q.   Again, you were asking for information.  You wanted a

24  report in chronological sequence of shares that had been issued

25  and shares that had been canceled, right?

1    A.  No.

2    Q.  I'm sorry.  You hadn't requested that in a prior e-mail?

3    A.  I had requested it, but that's not what this e-mail refers

4    to.

5    Q.  I understand that.  And I am sorry if I suggested that.

6             What I wanted to ask you was, those reports that you

7    requested for realtime information about issuances and

8    cancellations, if there is an issuance to somebody who is

9    trading in street name, the number of Cede shares goes up,

10   right?

11   A.  No, because they would be traded in street name so the

12   number would remain consistent.  The holder of those shares

13   would change, but the number would remain consistent.

14   Q.  What I am saying is, if there are additional free-trading

15   shares issued, or if new shares become free traded, that Cede

16   number will increase over time?

17   A.  Correct.  If they are put in electronic form, yes.

18   Q.  Exactly.  And if they are retired or canceled, that Cede

19   number will change, right?

20   A.  Correct.

21   Q.  It would shrink?

22   A.  Yes.

23             MR. TREMONTE:  Let's take that down and put up Defense

24   Exhibit 331.

25             I think DX 331 is not in evidence.  So I would offer

1    it, your Honor.

2              MS. HECTOR:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 331 received in evidence)

5    Q.  This is Defense Exhibit 331.  Do you see that?

6    A.  I do.

7    Q.  I want to direct your attention to the middle e-mail.

8              That's from Alexandra Albrecht, who you testified

9    earlier is with Continental.  August 2, 2010.  It's in the

10   evening, 6:09.  It's to you.  And she asks, "Were you able to

11   log in and access the shareholder list through our secured

12   portal?"  Do you see that?

13   A.  Yes.

14   Q.  And then you answered that you were, right?

15   A.  I answer, "Yes, I still need the restricted shares."

16   Q.  This is for Gerova, not Fund.com, right?

17   A.  That's correct.

18   Q.  Now you have got the electronic access and log-in, correct?

19   A.  It appears that way.

20             MR. TREMONTE:  Let's take that down.

21             Let's put up Defense Exhibit 334.

22             Also not in evidence, your Honor.  Defense offers 334

23   in evidence.

24             MS. HECTOR:  No objection.

25             THE COURT:  Received.

1                    (Defendant's Exhibit 334 received in evidence)

2    Q.   Do you see Defense Exhibit 334 is a chain of e-mails?

3    A.   Yes.

4    Q.   Directing your attention to the bottom one.

5              You see this is an e-mail from Eric Pinero, again, one

6    of the lawyers at Hodgson Russ, dated August 4, 2010, in the

7    morning.  It's to Ms. Albrecht and Ms. Mendez over at

8    Continental, right?

9    A.   Yes.

10   Q.   Mr. Pinero is asking them to kindly provide him with the

11   total number of ordinary shares of Gerova issued and

12   outstanding as of the close of business yesterday.  And he says

13   it's time sensitive.  Do you see that?

14   A.   Yes.

15   Q.   About an hour and change later, Ms. Albrecht responds to

16   Mr. Pinero, "The issued and outstanding as of yesterday is

17   141,071,601."  Do you see that?

18   A.   Yes, I do.

19   Q.   This indicates pretty clearly, doesn't it, that they can

20   get this kind of information to their customers or their

21   customer's counsel within an hour?

22   A.   Yes.

23                    (Continued on next page)

24

25

```
 1              MR. TREMONTE:  Take down 334.  Let's put up

 2   Defendant's Exhibit 335, please.  I offer Exhibit 335 into

 3   evidence.

 4              MS. HECTOR:  No objection.

 5              THE COURT:  Received.

 6              (Defendant's Exhibit 335 received in evidence)

 7              MR. TREMONTE:  This is an August 5th email.  We're now

 8   into the next month.  It's on the big screen, but not on the

 9   juror' screen.

10              THE COURT:  You can see that on the big screen?

11              MR. TREMONTE:  I could a minute ago.  Why don't I put

12   it on the ELMO.

13              JUROR:  Got it.

14              THE COURT:  Got it.

15   BY MR. TREMONTE::

16   Q.  Do you see Defendant's Exhibit 335 in evidence?

17   A.  Yes, I do.

18   Q.  It's from you, August 5th, 2010, 3:19 p.m.  It's to Michael

19   Grant, right?

20   A.  Yes.

21   Q.  Who is Michael Grant?

22   A.  Michael Grant was an employee that was hired subsequent to

23   the de-SPACing that was involved in the operational aspect of

24   Gerova.

25   Q.  And the subject is "Shares in float", right?
```

1    A.   Yes.

2    Q.   If you could read the email, please.

3    A.   "I received the restricted shareholder Continental.   We

4    have 10,989,553 shares in the float.   All the rest are

5    restricted.   Michael."

6    Q.   Okay.   By "in the float", you meant shares that could be

7    freely traded, right?

8    A.   Freely tradeable shares, yes.

9    Q.   You say, "The rest are restricted."   That means for one

10   reason or another they cannot be freely traded.

11   A.   Correct.

12            MR. TREMONTE:   We can take down 335.   Let's put up --

13   actually, I don't think we need to do that at all.

14   Q.   Directing your attention now to Government's Exhibit 609,

15   we're moving on, Mr. Hlavsa.   We were just in August, we're

16   going to keep going into August and September.   Okay?

17   A.   Yes.

18   Q.   You see Government's Exhibit 609, Mr. Hlavsa?

19   A.   I do.

20   Q.   Again, that's August 4th.   It's from you to the CEO Joe

21   Bianco, right?

22   A.   That's correct.

23   Q.   And what's the subject line?

24   A.   "Weston consulting agreement".

25   Q.   If you could read that for us.

1   A.  "Joe.  Found only agreements.  I recall it was trying to be

2   settled for stock, but I am not sure it ever was.  Gary wanted

3   to make sure we had recorded it as a liability."

4   Q.  Okay.  In previous emails, the ones we were looking at from

5   June, those emails also referenced a Weston agreement, correct?

6   A.  Yes, they did.

7   Q.  Those emails, when they referenced the Weston agreement,

8   they were talking about the Shahini consulting agreement,

9   right?

10  A.  I believe that's true.

11  Q.  That's a document that, again, reflects an obligation of

12  $2.2 million from the company to Mr. Shahini as of January,

13  2010, right?

14  A.  Correct.

15  Q.  Nothing in that document says anything about a settlement,

16  right?

17  A.  That's correct.

18  Q.  And nothing in that document says anything at all about

19  stock, right?

20  A.  Correct.

21  Q.  Okay.  We also looked at the Shahini warrant agreement,

22  right?

23  A.  Correct.

24  Q.  And that document does, in fact, reference a settlement,

25  correct?

1    A.   Correct.

2    Q.   In fact, it settled all disputes between the company and

3    Mr. Shahini, right?

4    A.   Yes.

5    Q.   And it also references stock that will be issued upon the

6    exercise of the warrant, right?

7    A.   Correct.

8             MR. TREMONTE:  Let's take that down.  I want to turn

9    to the documents in evidence as -- let's start with 600-A.

10   Q.   Mr. Hlavsa, do you see the document in evidence as

11   Government's Exhibit 600-A?

12   A.   I can't read the bottom, but I believe it to be.  There it

13   is.  Yes.

14   Q.   So you testified about these earlier, I think yesterday.

15   This is a transcript of a Skype chat that you were involved in,

16   right --

17   A.   Correct.

18   Q.   -- back in 2010?

19            I think you testified that you provided a number of

20   pages of recorded Skype chats to the government in response to

21   a subpoena; isn't that right?

22   A.   That's correct.

23   Q.   So what we're looking at on the screen is a selection from

24   that larger --

25            MS. HECTOR:  Objection.

1          THE COURT:  Basis?

2          MS. HECTOR:  Relevance.

3          THE COURT:  Mr. Tremonte.

4          MR. TREMONTE:  I'm going to ask him about this

5     document, and then I'm going to ask him questions about other

6     Skype chats, and I want the jury to understand that there's

7     more than this.

8          THE COURT:  I'll give you a little bit of latitude,

9     but I reserve the right to sustain an objection on the grounds

10    of relevance and cumulativeness.

11         MR. TREMONTE:  Understood, your Honor.  Thank you.

12    Q.  So directing your attention to the top of the document, you

13    see there's the date 9/27/2010, and then there's a time,

14    4:52:45 p.m.?

15    A.  Yes.

16    Q.  Okay.  Can you read the entry there?

17    A.  "Gary Hirst.  I'll get you the documents, but meanwhile,

18    here are the transactions.  One, January, 2010, finder's fee

19    agreement executed with Shahini for Weston, cash of over

20    2 million to be paid within 30 days, I think.  Number two,

21    March, 2010, Shahini agrees to take warrants (at the current

22    market price of the warrants at full settlement).  Number

23    three, in May, Shahini exercises the warrants cashless at the

24    current mark price of the shares, resulting in the issue of the

25    shares."

1    Q.   Okay.  So this information from Mr. Hirst appears to be in

2    response to some kind of a request; is that right?

3    A.   That's correct.

4    Q.   You had made a request of him for certain documents,

5    correct?

6    A.   I believe so.

7    Q.   And Mr. Hirst didn't have the documents at the time that he

8    made this response, right?

9              MS. HECTOR:  Objection, calls for speculation.

10             THE COURT:  If you know.

11             THE WITNESS:  I don't know.

12   Q.   Next entry at 4:57:43 p.m.  Can you read what you Skyped --

13   are you typing on a computer?  Is that what you're doing?

14   A.   Yes.

15   Q.   Could you read what you typed, please?

16   A.   "I will need the agreements (except for the finder's fee

17   which I have)."

18   Q.   Okay.  So again, that refers to the previous Skype, right?

19   A.   Correct.

20   Q.   You're indicating that you have one of the items that's

21   referenced there, right?

22   A.   Yes.

23   Q.   All right.  And then what does Mr. Hirst respond later in

24   the day?

25   A.   He responds later in the day, "Is this urgent for some

1    reason, or will a few days to gather the documents be okay?"

2    Q.  You respond, looks like 31 minutes later.

3    A.  Yes.  I respond, "We are recording all of the equity

4    issuances for the financials, just cannot finish without it."

5    Q.  Looks like there's no further communications between the

6    two of you by Skype on that date, correct?

7    A.  That's correct.

8    Q.  And so as of the end of the day on the 27th, at least based

9    on this exchange, you are aware of not only the existence of a

10   consulting agreement and the warrant agreement, but you've got

11   the information that there's been exercise and shares have been

12   issued, right?

13   A.  That's correct.

14   Q.  Sort of making our way down the text here, looks like you

15   exchange greetings in the morning, and then you talk about some

16   things that appear not to be related to the exchange that I was

17   asking you about earlier between 8:41 a.m. and approximately

18   11:31 a.m.; is that right?

19   A.  That's correct.

20   Q.  So that stuff in the middle is you're talking about

21   different topics, right?

22   A.  Yes.

23   Q.  And it looks like you had any number of things that you had

24   to talk about, business-related and otherwise, right?

25   A.  Yes.

1   Q.   Okay.  At 11:31 a.m. on the next day, Mr. Hirst says, "I

2   received the Shahini warrant," correct?

3   A.   Yes.

4   Q.   Okay.  Did you form an understanding when you got this

5   Skype as to what Mr. Hirst had been doing in between your last

6   exchange on this topic the day before and midday on the 28th?

7            MS. HECTOR:  Objection, calls for speculation.

8            THE COURT:  You can only testify to what you know.  If

9   you know it, you know it.  If you don't, you don't.

10           THE WITNESS:  I don't know.

11  Q.   All right.  And I think you testified yesterday that these

12  two occurrences of the name Gary Hirst on this document, your

13  recollection is that originally those would have been sort of

14  documents that were sent to you as Skype attachments.

15  A.   Correct.  File transfers.

16  Q.   File transfers.  Thank you.  And then it looks like for the

17  balance of the day you talk about D&O insurance, a lender's

18  license to Hodgson Russ, and other things related to law lines

19  in California, but not the Shahini consulting agreement or

20  warrants or share issuance, right?

21  A.   Correct.

22  Q.   Okay.  There's no apparent reaction here to your receipt of

23  these two documents, correct?

24  A.   Correct.

25           MR. TREMONTE:  Let's take this down and look at

1   Government's Exhibit 600-B in evidence.

2   Q.  Now you're onto the 30th, correct?

3   A.  Yes.

4   Q.  You see at the top it says that at 11:48:03 in the morning,

5   Mr. Hirst typed, "What do you need to know about the warrant

6   exercise," correct?

7   A.  Yes.

8   Q.  And what was your response?

9   A.  "6/23?  Calculation, instruction letter and legal opinion.

10  All documents supporting the issuance."

11  Q.  So that's 11:49, and then two minutes later, what does

12  Mr. Hirst say in response?

13  A.  He says, "I just sent you the calculation spreadsheet from

14  Shant."

15  Q.  Who is Shant?

16  A.  Shant Chalian with Hodgson Russ.

17  Q.  And then 2 minutes and 12 seconds after that, what did you

18  say?

19  A.  I say, "Just sent you the TAG agreement."

20  Q.  All right.  And then three minutes, or less than three

21  minutes after that, Mr. Hirst says, "I just sent the legal

22  opinion and instructions to Continental for the warrants."

23  What is your understanding that to mean?

24  A.  I understand that to mean that the legal opinion was

25  attached to the cover letter provided to Continental with

1    regard to the issuance of the Shahini shares.

2    Q.  Okay.  And you say, "Okay," and then you ask, "What about

3    Shahini?"  And Mr. Hirst sends -- again, as you recall at these

4    occurrences of his name -- he sends two more documents, right?

5    A.  Yes.  It appears one did not come through because it

6    indicates that the "warrant transfer file not found".

7    Q.  And why do you say it didn't come through?  Because

8    that's -- is that the sort of notification that you get when a

9    file didn't come through?

10   A.  Yes.

11   Q.  Then about five minutes later, it looks like you begin

12   discussing something else, right?

13   A.  Yes.

14   Q.  At 12:04:52 p.m., you say, "You had sent to me warrant

15   agreement for Shahini.  Where is settlement agreement to do the

16   conversion calculation," right?

17   A.  Yes.

18   Q.  He says, "Settlement is built into the warrant agreement,"

19   correct?

20   A.  Yes.

21   Q.  You say, "Never signed a warrant.  Have him get a

22   settlement agreement with one party executing," right?

23   A.  Yes.

24   Q.  Mr. Hirst says, "That's the extent of the warrant

25   agreement.  Doing so would accept the terms of the settlement,"

1    and then there's further discussion of that, correct?

2    A.  Yes.

3    Q.  Now, down at 12:15:28 you say, "Where is the calculation of

4    conversion shares?"

5    A.  I see that.

6    Q.  And then Mr. Hirst responds that he was on vacation in

7    California, documents were faxed to him, he remembers checking

8    it, and he got a calculation spreadsheet similar to what he

9    sent to you, right?

10   A.  Yes.

11   Q.  And then you ask, "Okay.  Who would have it?  Shant?"  And

12   he says, "I'll ask and get back to you," right?

13   A.  Yes.

14   Q.  Further down at 11:16 you say, "Here's the warrant

15   calculation" -- I'm sorry -- Mr. Hirst says, "Here's the

16   warrant calculation," and you respond, "Thanks," correct?

17   A.  Yes.

18          MR. TREMONTE:  Let's take that down and go to 600-D.

19   We don't have to do D.  You can take that down.  That's fine.

20   Q.  Now I'd like to bring up Defendant's Exhibit 509, please.

21          MS. HECTOR:  Government or defense?

22          MR. TREMONTE:  Government 509, please.  Your Honor,

23   may I have a moment?

24          THE COURT:  You may.

25          (Pause)

1           MR. TREMONTE:  If you can bring up Government's

2    Exhibit 509 in evidence, please.

3    BY MR. TREMONTE::

4    Q.  Mr. Hlavsa, do you see what is marked as Government's

5    Exhibit 509 in evidence on your screen?

6    A.  I do.

7    Q.  I'd like to focus on the lower email.  You can see it's

8    from you to Steve Weiss.  Subject is "Warrant".  And you say,

9    "Steve.  Per our conversation, attached are the documents that

10   I have received in connection with warrant being issued and

11   exercised," correct?

12   A.  Yes.

13   Q.  And then, if you look up at the top, you can see at least

14   the names of the documents that you sent around, right?

15   A.  Yes.

16   Q.  What are those documents?

17   A.  Continentaldocumentssupportingshareissuancedated052710 PDF,

18   Continentalshareissuance/legalopinion052710 PDF, Shahiniwarrant

19   PDF, Shahinifinalexecuted012210 PDF.

20   Q.  All right.  What did you send to Steve Weiss?  What are

21   those documents or what were those documents?

22   A.  It appears as though there are two documents that I had

23   saved that I had received from Continental; one being the share

24   issuance and the other one being the legal opinion.  Those are

25   the first two documents that are attached.  The third document

1    is the Shahini warrant, and the fourth document is the final

2    executed -- I would imagine by the date of that, that would be

3    the consulting fee agreement.

4           MR. TREMONTE:  Let's take that down.  We're going to

5    put up Government's Exhibit 500 in evidence.

6    Q.  Mr. Hlavsa, do you see Government's Exhibit 500 on the

7    screen?

8    A.  I do.

9    Q.  It's an email with attachments, and I'm going turn to the

10    first page of the first attachment.  Actually, I'm sorry, let's

11    make this clear for the record.

12           The email is a May 27th, 2010 email from Gary Hirst to

13    Ms. Albrecht of Continental Stock Transfer Company.  Do you see

14    that?

15    A.  Yes.

16    Q.  Okay.  And the subject line is "Gerova Financial share

17    issue," right?

18    A.  Yes.

19    Q.  You see there are three different attachments to that,

20    right?

21    A.  Yes.

22    Q.  So Gary Hirst transmitted documents to Continental on

23    May 27th in connection with the share issuance, right?

24    A.  I'd like to correct my previous response.  It appears there

25    may be two attachments, not three.

1   Q.   Okay.  But that's the substance of this email is Gary

2   transmitting these documents to Continental, right?

3   A.   Correct.

4   Q.   Okay.  And once Continental gets this information, they

5   have it in their file, right?

6   A.   Yes.

7   Q.   So turning to the first page of the first attachment, do

8   you see that letter on your screen?

9   A.   Yes, I do.

10  Q.   That's a May 26th, 2010 letter, again from Gary Hirst to

11  Continental, right?

12  A.   Yes.

13  Q.   Again, it's on Gerova letterhead, right?

14  A.   Yes.

15  Q.   This is from the company to the transferee, right?

16  A.   Yes.

17  Q.   It indicates that the company, Gerova, has received an

18  exercise notice, right?

19  A.   Yes.

20  Q.   And based upon that notice, the letter authorizes

21  Continental to issue shares to an individual, right?

22  A.   Yes.

23  Q.   And the name of the individual is listed in the letter

24  that's sent to Continental, right?

25  A.   Yes.  Well, the name is the account name, yes.  It's in the

1    letter.

2    Q.  Right.  But it states there that the shares are going to go

3    to Ridge Clearing, right?

4    A.  Yes.

5    Q.  And there's an account number for the shares to go to,

6    right?

7    A.  Yes.

8    Q.  And the account name is Ymer Shahini, right?

9    A.  That's correct.

10   Q.  Okay.  So this is one of the documents that was provided to

11   you in September by Continental, correct?

12   A.  Correct.

13   Q.  So forwarding to, not the next page, but the page after,

14   you see this document on the letterhead of Barry Feiner,

15   Esquire?

16   A.  I do.

17   Q.  Do you recognize that?

18   A.  I recognize it to be a legal opinion that was attached to

19   the share issuance letter.

20   Q.  So this, too, was in Continental's files and provided to

21   you in late September, correct?

22   A.  Correct.

23   Q.  And it had been in Continental's files since May 27th when

24   they initially received it, right?

25   A.  I'm assuming so.  I don't know for sure.

1  Q.  When you got these documents, you communicated them to --

2  I'm sorry -- you transmitted them to Steve Weiss, right?

3  A.  Yes.

4  Q.  And at that point, based on these documents and the other

5  documents in your possession, you knew exactly how many shares

6  had been issued, right?

7  A.  Correct.

8  Q.  And you knew to whom they had been issued.

9  A.  Yes.

10 Q.  And you understood that the record of the authorization for

11 the issuance was with Continental since May, correct?

12 A.  From the documents that I got, the issuance date of the

13 letter is May, yes.

14 Q.  Right.

15 A.  Yes.

16 Q.  Based on what you got from Continental it appeared -- they

17 were sending you a letter from May 27th, right, so you assumed

18 that they had it?

19 A.  Correct.

20 Q.  All right.  And you knew the amount of warrants that had

21 been exercised, correct?

22 A.  Yes.

23 Q.  Because that's set out here in the Barry Feiner letter,

24 right?

25 A.  Yes.

1   Q.  You also knew that they were being issued to an individual

2   who was offshore, right?

3   A.  Yes.

4   Q.  And subject to Reg S, correct?

5   A.  That's what the letter states.

6   Q.  All right.

7   A.  I had no personal knowledge, but that's what the letter

8   states.

9   Q.  Right.  That's the conclusion you drew based on the

10  information that you got from Continental, right?

11  A.  Correct.

12          MR. TREMONTE:  Let's move to October.  We can take

13  this down.  Let's put up Defendant's Exhibit 108 in evidence.

14  I'm sorry.  Don't publish it to the jury.

15          Your Honor, I'm just going to confer with government

16  counsel.

17          THE COURT:  All right.

18          You know what, ladies and gentlemen?  While they

19  confer, I suggest we take a break.  Please do not discuss the

20  case among yourselves or with anyone.  We'll be back in action

21  in 10 minutes.

22          (Recess)

23          THE COURT:  I appreciate the smiles on everybody's

24  faces.  You're wonderful people.

25          JURORS:  Same to you.

```
 1              THE COURT:  Please proceed.

 2              MR. TREMONTE:  Thank you, your Honor.

 3              If we could bring up Defendant's Exhibit 108, please,

 4    in evidence.

 5    Q.  I'm going to ask you while we're waiting for this,

 6    Mr. Hlavsa, I want to ask you some questions about October,

 7    2010, specifically around the board meeting in the beginning of

 8    October of that year.  Okay?

 9    A.  Yes.

10              MR. TREMONTE:  Your Honor, defense offers Defendant's

11    Exhibit 108 in evidence.

12              MS. HECTOR:  No objection.

13              THE COURT:  Received.

14              (Defendant's Exhibit 108 received in evidence)

15              THE COURT:  Thank you.

16    BY MR. TREMONTE:

17    Q.  So you've got on your screen there Defendant's Exhibit 108.

18    It's an email.  Do you see that?

19    A.  Yes, I do.

20    Q.  Who is it to?  Who is it from?

21    A.  It's to me.  It's CCing Joe Bianco, Gary Hirst, and Shant

22    Chalian from Stephen Weiss.

23    Q.  And the subject there is "Notice of a meeting of the Gerova

24    board for October 6th, 2010", correct?

25    A.  Correct.
```

1    Q.  And the first line of the body text is, "Michael, Joe and

2    Gary.  Below are suggested agenda item additions to the

3    meeting."  Do you see that?

4    A.  I do.

5    Q.  So this is Steve Weiss, the outside counsel to the lawyer,

6    proposing draft agenda items, right?

7    A.  It appears to be that.

8    Q.  These are the subjects that will be addressed or proposed

9    to be addressed at the directors' meeting, right?

10   A.  I believe so.

11   Q.  Michael is you, correct?

12   A.  Michael is me.

13   Q.  Joe is Joe Bianco, the CFO?

14   A.  That's correct.

15   Q.  And Gary is Mr. Hirst, right?

16   A.  Correct.

17   Q.  This is not unusual, correct?  Mr. Weiss would circulate

18   this kind of document in advance of board meetings regularly?

19   A.  I wouldn't say regularly.  He did it sometimes.

20   Q.  Sometimes.  Okay.  So you see it includes certain

21   information.  The location of the meeting is going to be in

22   Bermuda, there's a phone number for folks to dial in, right,

23   directors who are not present; is that right?

24   A.  Yes.

25   Q.  Then down towards the bottom it says, "The nature of the

1   business to be considered at the meeting is as follows:"  And

2   then there's a proposed agenda, right?

3   A.  Correct.

4   Q.  You see there there's a number of items.  The first one is

5   a report on the company's assets, right?

6   A.  Yes.

7   Q.  There's a report on the real estate portfolio from Planet 5

8   management.  That's just one of the transactions that the

9   company is in the process of evaluating, right?

10  A.  Yes, I believe so.

11  Q.  And then next, "Discussion of the status of the Stillwater

12  audit."  Do you see that?

13  A.  I do.

14  Q.  Next after that, "Discussion of the status of the Semore

15  Pearce and Ticonderoga transactions."  Do you see that?

16  A.  I do.

17  Q.  These are all things that are in the works at the time for

18  the company, right?

19  A.  Correct.

20  Q.  Things that you had awareness of in varying degrees of

21  involvement in, correct?

22  A.  Yes.

23  Q.  All right.  Next page, please.  Directing your attention to

24  item number 7.  Can you read that, please?

25  A.  It's, "Ratification of warrant for 11 million shares issued

1   on March 29th, 2010."

2   Q.   You understood this was a product of conversation between

3   you and Mr. Weiss and possibly others about the issuance of

4   shares to Mr. Shahini, correct?

5   A.   Would you repeat the question?

6   Q.   Sure.  You understood that this entry, number 7, is the

7   result of conversations between yourself and Mr. Weiss and

8   possibly others about the issuance of shares to Mr. Shahini?

9   A.   I don't recall.

10  Q.   You don't recall.

11  A.   I don't recall any specific conversation with Stephen

12  Weiss.

13  Q.   Okay.  You had sent to him documents relating to the

14  issuance of shares to Shahini, correct?

15  A.   That's correct.

16  Q.   About a week or so before this document is circulated,

17  right?

18  A.   Yes.

19  Q.   But you don't remember specific conversations with him

20  about it?

21  A.   Correct.

22  Q.   Understood.  Okay.  And it looks like 11 million shares

23  issued is the product of some kind of misunderstanding, right?

24  A.   I would say yes.

25  Q.   Why would you say that?

1  A.  Because the warrant was for 11 million shares, but

2  11 million shares were not issued.

3  Q.  Okay.

4  A.  So the word "issued" is probably the confusing text in this

5  line.

6  Q.  Thank you.

7         MR. TREMONTE:  I'm going to take that down and bring

8  up Defendant's Exhibit 109, which I'm going to offer into

9  evidence.

10        MS. HECTOR:  No objection, your Honor.

11        THE COURT:  Received.

12        (Defendant's Exhibit 109 received in evidence)

13  BY MR. TREMONTE:

14  Q.  You see in front of you Defendant's Exhibit 109?

15  A.  I do.

16  Q.  It's an email from Mr. Weiss at Hodgson Russ to yourself,

17  the CEO, and Mr. Hirst, correct?

18  A.  Yes.

19  Q.  CCed to Jason Galanis and Lucas Mann, right?

20  A.  Yes.

21  Q.  It's "revised agenda", right?

22  A.  Yes.

23  Q.  Mr. Weiss says he's added some agenda items that need to be

24  discussed and considered, and then let's turn to the next page,

25  the attachment.  So this looks to be sort of a more final

1    looking document, right?  It's got the letterhead and the term

2    "agenda" up there?

3    A.  It does.

4    Q.  And then you see you've got the time for the session

5    indicated, 11:00 a.m. to 1:00 p.m., right?

6    A.  Yes.

7    Q.  Directing your attention to item C where it says

8    "Administrative matters".  Do you see that?

9    A.  I do.

10   Q.  Looks like you've got the same entry from Mr. Weiss' prior

11   draft, "Ratification of warrant for 11.0 million shares issued

12   on March 29th, 2010?"

13   A.  Yes.

14   Q.  And that's also got an error in it, correct?

15   A.  I guess it depends on how you interpret it, because the

16   warrant did have the right to buy 11 million shares, but --

17   Q.  But 11 million shares had not, in fact, been issued,

18   correct?

19   A.  Not on March 29th, correct.

20   Q.  Over 5 million fewer shares had been issued, so this is a

21   mistake as of that date, right?

22   A.  Correct.

23           MR. TREMONTE:  Let's take that down.

24   Q.  That item was, in fact, on the agenda for the board

25   meeting, and it was voted on at the board meeting on

1    October 6th, correct?

2    A.  Yes, it was.

3    Q.  And that was a unanimous ratification of that share

4    issuance and two others, correct?

5    A.  That's correct.

6    Q.  And none of those share issuances had been authorized by

7    the board in a prior meeting, correct?

8    A.  That's correct.

9    Q.  The information that you had received about a week earlier

10   from Continental and Gary Hirst, that was all available to all

11   the board members, correct?  In other words, you didn't hide

12   that information from anybody, correct?

13          MS. HECTOR:  Objection, calls for speculation.

14          THE COURT:  I don't see where it calls for

15   speculation.  Do you understand the question?

16          THE WITNESS:  Repeat the question?

17   Q.  Yes.  You didn't keep the information that you possessed

18   about the Shahini share issuance to yourself, correct?

19   A.  Any director could ask me for any information.  I would

20   certainly provide that if requested, certainly.

21   Q.  You didn't hide any of that information from anyone, right?

22   A.  I certainly did not hide it, correct.

23   Q.  And you shared it with the general counsel, correct?

24   A.  Yes.

25   Q.  And you have no reason to believe that the general counsel

 1    would have hid any of this information?

 2            MS. HECTOR:  Objection.

 3            THE COURT:  If you know the motives or can speak to

 4    what the general counsel would or would not have done.

 5            THE WITNESS:  I do not know.

 6    Q.  And you specifically spoke with the CEO of the company

 7    about the share issuance after the board meeting, correct?

 8    A.  I'm not sure the timing when I spoke to the CEO, but I did

 9    speak with the CEO.

10    Q.  Could have been before, could have been during, could have

11    been after.

12    A.  Correct.

13    Q.  You went into that board meeting able to raise any issue

14    that you saw fit to raise, correct?

15    A.  Certainly.

16            MR. TREMONTE:  Turning our attention to January, I'd

17    like to bring up Government's Exhibit 579 in evidence.

18    Q.  You see Government's Exhibit 579 on the screen?

19    A.  I do.

20    Q.  You see it's from someone named Victoria Paper?

21    A.  I do.

22    Q.  Is that a name you recognize?

23    A.  I do not.

24    Q.  It's to the CEO, Gary Hirst, and Eric Pinero over at

25    Hodgson Russ?

1  A.  Yes.

2  Q.  Okay.  And it says in the body text, "Please see attached

3  letter requesting additional information from GFC."  Do you see

4  that?

5  A.  I do.

6  Q.  GFC is Gerova Financial Group, right?

7  A.  I would assume, yes.

8  Q.  Okay.  And down below it says that -- there's a signature

9  block.  Do you see that?

10  A.  I do not see that.

11  Q.  Bottom left, says "Vicki Paper".

12  A.  Yes, I see that.  I'm sorry, yes.

13  Q.  And that says that Ms. Paper is a lead analyst/listing

14  compliance with New York Stock Exchange Regulation, Inc.  Do

15  you see that?

16  A.  I see that.

17         MR. TREMONTE:  I'd like to take that down and put up

18  Government's Exhibit 580 in evidence.

19  Q.  Do you see Government's Exhibit 580 on your screen?

20  A.  I do.

21  Q.  That's a January 13th, 2011 letter from New York Stock

22  Exchange Regulation, correct?

23  A.  Yes, it appears so.

24  Q.  This document requests certain information from the

25  company, correct?

1    A.   It appears to say that, yes.

2    Q.   Second sentence of the top paragraph.  "On January 5th,

3    2011, an article about Gerova was published on forums.com

4    website which makes certain allegations about the company and

5    its apparent affiliation with Mr. Jason Galanis."  Do you see

6    that?

7    A.   I do.

8    Q.   It's requesting various categories of information about

9    that, right?

10   A.   It appears to, yes.

11        MR. TREMONTE:  Let's take that down.

12   Q.   I'm going to show you a document marked for identification

13   as Defendant's Exhibit 200.  Have a look at that, Mr. Hlavsa,

14   and let me know when you've had a minute to review it.

15   A.   You want me to review the whole document or just

16   acknowledge I have it?

17   Q.   Acknowledge you have it, take a look at it.

18   A.   Okay.

19        (Continued on next page)

20

21

22

23

24

25

1   BY MR. TREMONTE:

2   Q.  I am going to ask you, is that a document that you're

3   familiar with?

4   A.  I can't recall.  It appears to be a draft of the document.

5   I can't recall my familiarity with it.

6   Q.  OK.  That's fine.

7           MR. TREMONTE:  Let's bring up Defense Exhibit 201.

8   And that's not in evidence.  I am going to offer it, your

9   Honor.

10          THE COURT:  All right.

11          Any objection?

12          MS. HECTOR:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 201 received in evidence)

15          MR. TREMONTE:  It is a multipage document so I am

16  going to bring a copy to the witness, your Honor.

17  Q.  Directing your attention to the top of the first page,

18  Mr. Hlavsa.

19  A.  Yes.

20  Q.  You see where it says, "Reference is made to your letter of

21  January 13, 2011"?

22  A.  Yes, I do.

23  Q.  And then after that, "Pursuant to the listing agreement of

24  Gerova Financial Group, Ltd. ('the company') and Section 901.02

25  of the listed company manual of the New York Stock Exchange,

1    set forth below are the company's responses to the information

2    requested in the New York Stock Exchange letter."

3         Do you see that?

4    A.  I do.

5    Q.  That's a reference to the January 13 letter that I just

6    showed you a few minutes ago, right?

7    A.  Yes, I believe so.

8    Q.  This is a draft of the company's response to that letter,

9    correct?

10   A.  OK.  I agree.

11   Q.  I want to direct your attention, please, to the page that's

12   got on the bottom -- actually, it's two pages from the end on

13   the paper copy.  Electronically it's got the Bates stamp that

14   ends in 209 on it.

15   A.  OK.

16   Q.  Do you see there is a paragraph towards the bottom that

17   begins, "In March 2010"?

18   A.  I do.

19   Q.  Read that paragraph, please.

20   A.  "In March 2010, prior to Mr. Galanis's employment by our

21   affiliate (October '10), we agreed to issue to Mr. Galanis a

22   three year warrant entitling the holder to purchase up to 2.2

23   million of our ordinary shares at an exercise price of $37.50

24   per share.  The warrant was issued in lieu of a cash payment of

25   a fee that we had previously agreed to pay to Mr. Galanis or

1   his assigns in consideration for his facilitating our

2   acquisition of the assets of the Wimbledon funds in January

3   2010 and his introduction of Keith R. Harris and the

4   opportunity to acquire Seymour Pierce.  We valued the warrant

5   at 2.2 million or $1.00 per warrant share, which was the

6   average of the closing prices of our publicly traded warrants

7   during the 30 days prior to March 29, 2010 (adjusted for the 1

8   to 5 reverse stock split).  On the date of issuance of the

9   warrant the closing price of our ordinary shares was $28.80 on

10  a split adjusted basis."

11  Q.  I would like to break that down, and let's just take the

12  sentences in order.

13          The first clause there, "In March 2010," was picked up

14  later in the paragraph.  There is a reference to March 29,

15  2010.  That's the same date as the date of the Shahini warrant

16  agreement, correct?

17  A.  It is.

18  Q.  The next clause there where it says, "Mr. Galanis's

19  employment by our affiliate."

20          Mr. Galanis was not an employee of Gerova, correct?

21  A.  That's correct.

22  Q.  But he was, in fact, the CEO of an affiliate, right?

23  A.  That's correct.

24  Q.  What was the name of that affiliate?

25  A.  Gerova Advisors.

1    Q.  That was a subsidiary?

2    A.  Wholly-owned subsidiary of Gerova Financial Group.

3    Q.  So this is saying that March came before Mr. Galanis's

4    employment with the affiliate?

5    A.  That's correct.

6    Q.  Next, "We agreed" -- that's the company, right?

7    A.  I would believe so, yes.

8    Q.  -- "to issue Mr. Galanis a three year warrant."

9           That's the same duration as the Shahini warrant,

10   correct?

11   A.  Yes.

12   Q.  And it says, "Entitling the holder to purchase up to 2.2

13   million shares at an exercise price of $37.50 per share."

14          Those numbers are different from the Shahini

15   agreement, correct?

16   A.  Yes, they are.

17   Q.  But if you look down at the parenthetical towards the

18   bottom of the paragraph it says, "Adjusted for the 1 to 5

19   reverse stock split."

20          There had been a stock split, correct?

21   A.  I believe there was.  I just don't specifically recall

22   when.

23   Q.  Actually, let me show you, just so we can nail this issue

24   down, let me show you what has been marked for identification

25   as Defense Exhibit 114.

1          MR. TREMONTE:  Actually, I will offer it into

2    evidence.

3          THE COURT:  Any objection?

4          MS. HECTOR:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 114 received in evidence)

7    Q.  You see Defense Exhibit 114 on your screen?

8    A.  I do.

9    Q.  That's an SEC filing by Gerova, correct?

10   A.  Yes, it is.

11   Q.  There is a lot on that page there.  Take your time.

12   A.  Yes, it is.

13   Q.  That's a Form 8-A amended, right?

14   A.  Yes.

15   Q.  This form was filed while you were the CFO of the company,

16   correct?

17   A.  Yes, it appears to be.

18   Q.  Let's turn to the next page.

19          If you look at the second paragraph it says, "As

20   previously disclosed by Gerova on June 2" -- the sentence is a

21   little convoluted.  It's saying on May 21 the board approved

22   amendments to the preexisting company warrant agreement with

23   Continental Stock to do certain things, right?

24   A.  It appears to say something similar to that, yes.

25   Q.  Then one of the things that happened on May 21 is the

1   arrangement was offered so that the exercise price of the

2   company's publicly traded warrants changed from 7.50 to 7,

3   correct?

4   A.  Yes, that's correct.

5         MR. TREMONTE:  Let's bring 201 back up.

6   Q.  Anyway, at some point there was a stock split during 2010,

7   correct?

8   A.  I don't personally remember.

9   Q.  Assuming that the information here is correct about the

10  stock split, if you multiply the 2.2 million of our ordinary

11  shares by five, you get 11 million, correct?

12  A.  Yes, you do.

13  Q.  If you divide the 37.50 by five, you get 7.50, right?

14  A.  Yes.

15  Q.  So your strike price would be 7.50 for 11 million warrants,

16  on a split adjusted basis, correct?

17  A.  That appears to be correct, yes.

18  Q.  And if you also factored in the May 21, 2010 adjustment to

19  the exercise price, you would have a strike price of 7, right?

20  A.  Yes.  If it was applicable for this period of time, which I

21  can't validate that one way or another.

22  Q.  That's fine.

23        Next sentence:  "The warrant was issued in lieu of

24  cash."

25        That's just like the Shahini warrant agreement,

1    correct?

2    A.   Yes.

3    Q.   Here it says, "In payment of a fee we had previously agreed

4    to pay to Mr. Galanis or his assigns."

5          Do you see that?

6    A.   I do.

7    Q.   An assign is somebody that you designate to receive a thing

8    that you're entitled to, correct?

9    A.   I believe so.

10   Q.   And it says, in consideration for his facilitating our

11   acquisition of the Wimbledon fund assets, right?

12   A.   Yes.

13   Q.   And other things.

14          Are you familiar with Keith R. Harris and the

15   opportunity to acquire Seymour Pierce?

16   A.   I am.

17   Q.   And you're aware that Jason Galanis was involved in that

18   effort?

19   A.   Yes, I am.

20   Q.   Did that effort ever come to fruition?

21   A.   No, it did not.

22   Q.   But there was an extended period of negotiations trying to

23   get that deal done, right?

24   A.   Yes, at some time there was.

25   Q.   Next sentence:  "We valued the warrant at 2.2 million."

1          Again, if you multiply that by five, you get $11

2    million, right?

3          I'm sorry.  "We valued the warrant at 2.2 million or

4    $1.00 per warrant share."  That's 11 million warrant shares.

5          Then the next clause it says, "The average of the

6    closing prices of our publicly traded warrants during the 30

7    days prior to March 29."

8          That's the same formula that's in the "whereas" clause

9    on the first page of the Shahini warrant agreement, correct?

10   A.   Yes.

11   Q.   And then the last sentence says, "On the date of the

12   issuance of the warrant the closing price of our ordinary

13   shares was $28.80 on a split adjusted basis."

14         According to the math in this paragraph, it means that

15   on the date of the issuance of the warrant, on March 29, it was

16   under water, correct?

17   A.   Yes.

18   Q.   OK.  If you can read the next paragraph, please.

19   A.   "How does this respond to their question?  Why is this

20   here?  At Mr. Galanis's request we issued the warrant to a

21   business associate of Mr. Galanis (who is not affiliated with

22   the company) who is his partner in an unrelated entity formed

23   by Mr. Galanis and his associate to engage in investments in

24   natural resources businesses unrelated to the company.  On May

25   26, 2010, Mr. Galanis's partner exercised the warrant and,

1    pursuant to the cashless exercise provisions thereof, received

2    1,066,666 of our ordinary shares which he then assigned to his

3    partnership with Mr. Galanis.  As a result of Mr. Galanis's

4    ownership of 50 percent of the equity of such partnership, he

5    therefore has a beneficial interest in 533,333 of the ordinary

6    shares currently owned by such partnership."

7    Q.  That again is a very dense paragraph.  Why don't we break

8    it down.  Let's go back up to the beginning of that paragraph.

9         First of all, let me ask you, the part there that is

10   in all caps, "How does this respond to their question?  Why is

11   this here?", that appears to be some kind of comment on the

12   text, is that fair?

13   A.  Yes.

14   Q.  Is that your comment to the text?

15   A.  It is not.

16   Q.  Do you know whose it is?

17   A.  I do not.

18   Q.  The next sentence:  "At Mr. Galanis's request we issued the

19   warrant to a business associate."

20        So that seems to indicate that the warrant went not to

21   Mr. Galanis, but to one of his assigns, correct?

22   A.  Yes.

23   Q.  And the assign here is apparently a partner in an unrelated

24   entity.  And I take it by unrelated, that means not related to

25   Gerova, correct?

1    A.   Unrelated would be unrelated to Gerova.

2    Q.   So it's an entity not related to Gerova, formed by Mr.

3    Galanis and his associate, the assign, "to engage in

4    investments in natural resources businesses unrelated to the

5    company."

6         Now, Gerova had been in '09 at least trying to get

7    into the natural resources business, correct?

8    A.   Yes.

9    Q.   And that was through an entity called White Energy, is that

10   right?

11   A.   That's correct.

12   Q.   I don't want to take too much of a detour here, but that

13   was supposed to be one of the companies that was acquired in

14   connection with the de-SPAC, right?

15   A.   Yes, that was contemplated.

16   Q.   That was back in '09 and Mr. Galanis handled those

17   negotiations?

18   A.   I believe he was involved in the negotiations, yes.

19   Q.   So he was pursuing this natural resources opportunity.   And

20   that deal actually got papered, didn't it?

21   A.   Yes, it did.

22   Q.   And the parties reached an agreement, but somehow that

23   agreement fell apart, is that right?

24   A.   I think that's a fair characterization.

25   Q.   As part of that agreement, because the deal fell apart,

1   Gerova got something like three-and-a-half million dollars as a

2   termination fee or something, right?

3   A.   There was a break-up fee involved, and I believe it was a

4   substantial amount of money.   I don't recall the exact amount.

5   Q.   Fair enough.

6        Next sentence here:   "On May 26, 2010, Mr. Galanis's

7   partner exercised the warrant."

8        So that indicates that this assign exercised, said he

9   wanted to buy the shares that were available under the

10  agreement, right?

11  A.   Yes.

12  Q.   And he did it pursuant to the cashless exercise provisions

13  thereof.   Do you see that?

14  A.   Yes.

15  Q.   Do you have an understanding of what that means?

16  A.   Yes, I do.

17  Q.   I think you explained this yesterday, but just to

18  summarize, the idea is you can exercise a warrant one of two

19  ways.   You can just buy all the shares, right, with cash, or

20  you can sort of notionally sell enough shares to the company to

21  get enough cash to buy the balance, right?

22  A.   I think that's fair.

23  Q.   More or less, right?

24       So he went with door number two, this assign; he did

25  it cashless, right?

1   A.   Correct.

2   Q.   After the exercise he got a million sixty six shares.

3         Now, again, if you adjusted for the split, 1,066,666

4   times five comes out almost exactly to 5,333,333, correct?

5   A.   I assume you're right.

6   Q.   The next sentence:  As a result of Mr. Galanis's ownership

7   of half of the equity of the partnership, he therefore has a

8   beneficial interest in half of the ordinary shares owned by the

9   partnership.

10        Do you see that?

11  A.   Yes, I do.

12  Q.   What do you understand that to mean?

13  A.   It means that if the partnership owned the shares and he

14  was a 50 percent partner in that partnership, that he would own

15  50 percent of the shares that the partnership owned.

16  Q.   I just want to go back two pages.  Sorry to be jumping

17  around.  I want to make sure we are oriented in the document.

18        THE COURT:  How are you doing on time on your

19  cross-examination, Mr. Tremonte?

20        MR. TREMONTE:  I'd say there is another three or four

21  versions of this document.  And then there is another document

22  which has multiple versions that I will want to spend some time

23  on.  And then there is a little bit of cleanup.

24        THE COURT:  Can you give me a time estimate?

25        MR. TREMONTE:  I should think that would take about an

1    hour.

2            THE COURT:   Thank you.

3    BY MR. TREMONTE:

4    Q.   Directing your attention, Mr. Hlavsa, to the center of the

5    page, item 6, "Provide the detail of any related party

6    transactions not already included in your response."

7            Do you see that?

8    A.   I do.

9    Q.   Do you have an understanding as to what a related party

10   transaction is?

11   A.   Yes.

12   Q.   What is that understanding?

13   A.   Related party is entities that an officer or director would

14   be represented in both of the entities so it would be

15   considered a related party.

16   Q.   And the reason why that heading is there is because it's an

17   indication in this draft that what follows is intended to

18   respond to the Stock Exchange's question about related party

19   transactions, right?

20   A.   I don't know.  I'm assuming you're right.

21   Q.   Now, if I could draw your attention to the last page, not

22   the last page of text but the last page of the document.

23           This is an indication that the document is a track

24   changes document, right?

25   A.   I believe so, yes.

1   Q.  So it includes information about some of the changes that

2   are made, who is making them, and the time, right?

3   A.  Yes.

4   Q.  I just want to make sure that we are clear on the time that

5   this document was worked on.  It's January 24, 2011, sort of in

6   the evening, like in the 7, 8, 9:00 range, right?

7   A.  It appears to be correct.

8          MR. TREMONTE:  Let's take that down and let's put up

9   Defense Exhibit 203, which I will offer in evidence.

10          MS. HECTOR:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 203 received in evidence)

13   Q.  Also a multipage document so I am going to bring you a

14   copy, Mr. Hlavsa.

15          Do you see Defense Exhibit 203 on the screen?

16   A.  Yes, I do.

17   Q.  This is an e-mail, right?

18   A.  Yes, it is.

19   Q.  From Stephen Weiss, dated January 26, 2011, at 1:09 p.m.

20   Do you see that?

21   A.  I do.

22   Q.  This is two days after the comments to the draft we were

23   just looking at, right?

24   A.  That is correct.

25   Q.  It's sent to the CEO, yourself, the CFO, Mr. Hirst, Jason

1   Galanis, Lucas Mann -- those are all people who have some

2   involvement with Gerova -- as well as two of the other lawyers

3   at Hodgson Russ, right?

4   A.  Correct.

5   Q.  Mr. Weiss is communicating the latest updates to the draft

6   of this response to the New York Stock Exchange letter, right?

7   A.  Yes.

8   Q.  And he is including both a clean draft as well as a mark-up

9   draft?

10  A.  Yes.

11  Q.  Directing your attention to the mark-up draft, it's

12  actually numbered page 11 in the hard copy document, and

13  electronically it ends in the Bates stamp 221.

14          MR. TREMONTE:  If we could magnify the paragraph that

15  begins "in March 2010," please, so the jury can see it.

16          If we could scroll up a little bit so we get both that

17  paragraph and the following paragraph.  Good.

18  Q.  Do you see that, Mr. Hlavsa?

19  A.  I do.

20  Q.  Take a minute to look at that.

21  A.  OK.

22  Q.  Do you see that first paragraph is very similar to the

23  first paragraph that I asked you to read --

24  A.  Yes, it is.

25  Q.  -- on the prior document, right?

 1    A.   Yes.

 2    Q.   Again, March 2010.  It omits the sort of generic

 3    description of "our affiliate" and instead specifies that it's

 4    Gerova Advisors LLC, correct?

 5    A.   Yes.

 6    Q.   And then it specifies "the company," although it leaves in

 7    "we" as the subject of that sentence.

 8         Take a look at that, but the best I can tell, most of

 9    the information in that paragraph is the same.

10    A.   I agree.

11    Q.   Then the paragraph that follows, it's all again very

12    similar to what we saw in the previous draft, correct?

13    A.   Yes.

14    Q.   Except that in this draft it's struck through, right?

15    A.   I see that, yes.

16    Q.   It appears as though the drafter of this document intended

17    to remove this second paragraph, correct?

18         MS. HECTOR:  Objection.  Calls for speculation.

19         THE COURT:  I think this witness has shown an ability

20    to describe how documents are generated.

21         Do you understand the question?  The question I think

22    was, do the lines crossing out the material indicate to you

23    that the author intended to delete that material?

24         THE WITNESS:  Yes, I do.

25    Q.   Did you suggest this deletion?

1    A.  I don't recall.  I don't think so.  I don't recall.

2    Q.  Do you recall having any opinion about the deletion?

3    A.  No.

4            MR. TREMONTE:  Let's take that down and move on to

5    Defense Exhibit 209, which I would offer in evidence.

6    Q.  This document is not in evidence.

7    A.  Go ahead.

8    Q.  Directing your attention to the handwritten notation in the

9    upper right-hand corner.  Do you see that?

10           I don't want you to read from the document.  I just

11   want to direct your attention to certain parts of it.

12           Do you see that?

13   A.  Yes.

14   Q.  Do you recognize that?

15   A.  No.

16   Q.  Do you recognize the name?

17   A.  Yes.

18   Q.  Do you understand the notation?

19   A.  Yes.

20   Q.  Directing your attention further to page 3.

21   A.  3?

22   Q.  Yes, please.

23   A.  I'm there.

24   Q.  Do you see to the right of the body text in the margin

25   there is a comment?

```
 1    A.  Yes, I do.

 2    Q.  And next to that there is a set of initials and a number?

 3    A.  Yes.

 4    Q.  Do you recognize those?

 5    A.  Yes.

 6    Q.  Further on, page 4, same question.  Do you recognize those

 7    initials next to the comment?

 8    A.  I do.

 9    Q.  On page 11, do you see that?

10    A.  I do.

11    Q.  Do you recognize those initials as a designated commenter

12    on the document?

13    A.  Excuse me?  Repeat the question.

14    Q.  Do you recognize those initials as a designated commenter

15    on the document?

16    A.  Yes.

17    Q.  They are the same as the ones on the next page too, right?

18    A.  Yes.

19    Q.  So this is a document that you provided comments on?

20    A.  It is.

21            MR. TREMONTE:  Your Honor, I offer it in evidence.

22            THE COURT:  Any objection?

23            MS. HECTOR:  We just have an objection to the

24    handwritten comments on this document since Mr. Hlavsa has said

25    he does not recognize them and did not write them.  We don't
```

1    know who wrote them.

2             THE COURT:  All right.  Mr. Tremonte, can you replace

3    this with a redacted version?

4             MR. TREMONTE:  May I have a moment, your Honor?

5             The answer is yes.  I will just take a moment.

6             THE COURT:  Sure.

7             I will allow you to question the witness on the

8    document, but you can't highlight anything in handwriting, and

9    then you can replace it over the weekend.

10            (Defendant's Exhibit 209 received in evidence)

11            MR. TREMONTE:  There is only one comment that I am

12   aware of.

13   BY MR. TREMONTE:

14   Q.  You see on the screen in front of you --

15            MR. TREMONTE:  And the jurors should have it too.

16            JUROR:  Not yet.

17            MR. TREMONTE:  It's Defense Exhibit 209 in evidence.

18   Q.  While we are waiting for that to come up, Mr. Hlavsa, this

19   is another draft of the same document, correct?

20   A.  I believe it is.

21   Q.  I am going to turn the page now.

22            Again, this is another version of the draft of the

23   response to the New York Stock Exchange inquiry in January

24   2011, correct?

25   A.  Yes.

1   Q.  And directing your attention to page 3, the document is in

2   track changes, correct?

3   A.  Yes.

4   Q.  You see there are comment boxes in the margin to the right

5   of the main text, right?

6   A.  That's correct.

7   Q.  And next to some of the comments there are initials in hard

8   brackets, right?

9   A.  Yes.

10  Q.  And those are your initials, right?

11  A.  They are.

12  Q.  Indicating that they are your comments, correct?

13  A.  That's correct.

14  Q.  Directing your attention to page 11.

15          Do you see the paragraph beginning "in March 2010"?

16  A.  I do.

17  Q.  Now, in this draft that you're commenting on -- you're

18  commenting on the draft, not this paragraph, but in this draft

19  we have got a paragraph that looks substantially the same as

20  the paragraph from the last version with the minor

21  modifications, including naming Gerova Advisors LLC

22  specifically, correct?

23  A.  Yes.

24  Q.  And in this draft the second paragraph that was struck

25  through in the prior draft is gone, correct?

 1   A.  Yes, it is.

 2           MR. TREMONTE:  Can we bring up Defense Exhibit 589?

 3   Q.  Mr. Hlavsa, the draft that you commented on, that's

 4   something that you did in connection with your responsibilities

 5   as CFO of the company, right?

 6   A.  Yes.

 7   Q.  You took seriously the notion that you had to provide

 8   accurate responses to an inquiry from the New York Stock

 9   Exchange, correct?

10   A.  Certainly.

11   Q.  I'm sorry.  I want to show you Government Exhibit 589.

12           It's a multipage document so I am going to give you a

13   hard copy.

14           You see Government Exhibit 589 on the screen?

15   A.  I do.

16   Q.  This is on Gerova letterhead, correct?

17   A.  Yes, it is.

18   Q.  It is dated January 28, 2011?

19   A.  It is.

20   Q.  It's addressed to New York Stock Exchange Regulation?

21   A.  Yes.

22   Q.  It begins, "Reference is made to your letter of January

23   13," correct?

24   A.  Yes.

25   Q.  So this is either the final or near-final draft of the

1   company's response to the New York Stock Exchange, correct?

2   A.  Yes.

3   Q.  Directing your attention now to page 11.

4          MR. TREMONTE:  I am going to ask if we can magnify the

5   paragraph that begins "in March 2010."

6   Q.  So you see here, the first sentence beginning "in March

7   2010," that's the same as the last two drafts that I showed

8   you, correct?

9   A.  Yes, it is.

10  Q.  Right down to the typo including both the word "company"

11  and the word "we" as subjects of the sentence, right?

12  A.  Yes.

13  Q.  The next sentence:  "The warrant was issued in lieu of a

14  cash payment."

15         That's the same, right?

16  A.  Yes.

17  Q.  Next sentence:  "We valued the warrant at 2.2 million."

18         That's the same?

19  A.  Yes.

20  Q.  The same reference to the reverse stock split, right?

21  A.  Yes.

22  Q.  Next sentence:  "On the date of issuance of the warrant

23  closing price was $28.80 on a split adjusted basis."

24         That's the same, right?

25  A.  Yes.

1   Q.  Now it appears we have got some new sentences that are

2   different from the last two versions you looked at.

3           First is, "Mr. Galanis advises that he transferred the

4   warrants to a limited partnership unrelated to the company or

5   its business."

6           Do you see that?

7   A.  Yes, I do.

8   Q.  Then following the comma:  "In connection with his capital

9   contribution to the partnership and in consideration for a

10  settlement agreement with the general partner."

11          Do you see that?

12  A.  Yes, I do.

13  Q.  Now, the sentence is a little bit unclear, at least to me,

14  but where it says "in connection with his capital contribution

15  to the partnership," the partnership that is being referred to

16  is the partnership that gets the warrants, which is a limited

17  partnership unrelated to Gerova, right?

18  A.  Yes.

19  Q.  And the final sentence, if you could read the final

20  sentence.

21  A.  "Mr. Galanis advises that he was never a general partner of

22  such partnership, nor did he control a majority limited

23  partnership interests.  He further advises that in 2010 he

24  ceased being a limited partner in the limited partnership."

25  Q.  Again, pretty dense.  Let's break those down.

1          So Mr. Galanis advises -- he is telling the company,

2     right, that he was never a general partner of the partnership?

3          What did you understand that to mean?

4     A.  I believe the general partners have different rights and

5     responsibilities than limited partners.

6     Q.  And he also didn't control a majority limited partnership

7     interests.

8          What did you understand that to mean?

9     A.  It means he was not in control of the partnership.

10    Q.  Finally, he is indicating that he ceased being even a

11    limited partner in the limited partnership, right?

12    A.  Yes.

13    Q.  That's sort of a convoluted way of saying he no longer has

14    anything to do with it, right?

15    A.  That's correct.

16    Q.  So this is different, isn't it, from I think three drafts

17    ago, where there was an indication that Mr. Galanis remained a

18    beneficial owner of half the shares that were issued under the

19    warrant agreement, right?

20    A.  Yes.

21    Q.  And is it fair to say that this paragraph constitutes the

22    shared understanding of all the people who had a hand in

23    drafting it as to what happened with the Shahini shares?

24          MS. HECTOR:  Objection.

25          THE COURT:  Sustained.

1    Q.  You reviewed all of the drafts that were circulated to you

2    on this important document, correct?

3    A.  I did.

4              MR. TREMONTE:  We can take that down.

5              THE COURT:  All right.  Ladies and gentlemen, we are

6    going to take an early break for the weekend.

7              With the weekend upon us, you are going to be seeing

8    more of family and friends, I hope.  You won't be here

9    tomorrow.  You will be maybe at work or doing other things.  I

10   realize you're not going to be just resting on a lounge chair

11   someplace.  You have busy lives you have to take care of.

12   Loved ones who need you and depend on you.  As I said to you

13   the other day, laundry, dry cleaning, and things like that.  We

14   are all afflicted with the human condition.

15             I hope you have a great weekend, but I want to give

16   you a special reminder.  You can't talk about the case with

17   anyone.  After the case is over, you can tell everybody what

18   happened in the case, who said what, the high points, the

19   exciting moments.  You can do all of that.  But not now.  Not

20   now.  And the same is true, as I told you, about things like

21   going off on your own and doing your own research.  You're

22   smart people.  I know you probably can do a lot of that kind of

23   stuff.  But it's a violation of your oath as jurors.  If you

24   were involved in this case as a participant, or one of your

25   family members were, you would want jurors who followed the

1    judge's instruction and played by the rules.  And the rules are

2    that the evidence is what comes out in the courtroom.

3              So with that, I hope you have a great weekend, and we

4    will see you back on Monday for a start at 10:00, which means

5    the lines are a little bit longer coming in on Monday into the

6    courthouse, so try and get here a little bit earlier so we can

7    get this case or we can keep this case on track.  It's on

8    track.  I promise you that.  But let's see whether we can keep

9    that going so that you can fulfill your obligations here as

10   jurors and then resume full time your lives.

11             So have a great weekend, and I will see you on Monday

12   morning.

13             (Jury exits courtroom)

14             THE COURT:  With respect to the expert issue, this is

15   where I come out.  Unless there is a stipulation, and subject

16   to any Daubert issue, which the government has indicated it may

17   wish to raise, and any inquiry that needs to be made on the

18   subject, I propose to allow the defendant to call an expert

19   with regard to the metadata.  And I think what ultimately

20   pushed me over the top -- I want to get from Mr. Tremonte the

21   date of the subpoena.  Do you have that?

22             MR. TREMONTE:  I had it in my head this morning.

23             June 17, your Honor.

24             THE COURT:  What pushed me over the top -- and we are

25   not talking fault here, we are talking about reality --

1    apparently the government got ahold of a document from the SEC,

2    which put the defendant -- the government did what it was

3    supposed to do, it turned it over to the defendant.  It put the

4    defendant on notice that there were more documents available

5    from the subpoenaed party, which it had not obtained and it

6    pressed for.  So if it had gotten what it was entitled to get

7    in the ordinary course, it could have timely given the

8    disclosure.

9         So really the issue is about the timeliness of the

10   defendant's disclosure.  And I am satisfied that there is no

11   prejudice to the government with regard to its opening

12   statement.  I don't think this came up as such.  And the

13   government will have the latitude to cross-examine the witness

14   and, if it chooses to, to call its own expert in rebuttal.  The

15   whole thing may turn out to be not much of an issue if time

16   stamps are as easily manipulable as the government has

17   suggested they are.  I don't know.  I don't know whether it

18   will be an issue or it won't be an issue, but that's how I come

19   out on this.

20        MR. BLAIS:  Your Honor, may I raise two issues in

21   connection with that, very briefly?

22        THE COURT:  Yes.

23        MR. BLAIS:  One is, given your Honor's ruling, which

24   we understand, it may be our intention to in fact call an

25   expert witness, to the extent we can lie it up, in our case in

1   chief, not simply on rebuttal.  We will obviously provide

2   expert notice as to that individual as soon as we find that

3   individual.

4          THE COURT:  You have to have latitude as well.

5          MR. BLAIS:  Understood.

6          Just one question in connection with the ruling

7   because this is an issue I think that was not discussed in the

8   colloquies yesterday about the time as to when they actually

9   got this document from Hodgson Russ.

10         I think the point we made in the opening paragraph of

11  our motion to preclude was that this document was a document

12  that originated with Mr. Hirst.  It was Mr. Hirst who sent it

13  to Mr. Hlavsa, who sent it to Mr. Weiss at Hodgson Russ, and

14  obviously obtained the document from Hodgson Russ.  But there

15  is some question, given all of the Rule 16 material that we

16  have gotten from the defendant, which includes slews of e-mails

17  and other documents from 2010, whether or not this document, in

18  fact, existed in the defendant's possession, custody or control

19  for the entirety of this case and whether it was in fact

20  necessary for them to obtain it from Hodgson Russ in order to

21  have this data available.  I think that question has not been

22  addressed.

23         THE COURT:  Mr. Tremonte.

24         MR. TREMONTE:  The answer there is no, we didn't have

25  it.  And on that front too, we made all sorts of efforts to

1    find it.  I don't want to get into privilege in open court, I

2    would be happy to do it at sidebar, but I am representing to

3    the Court emphatically that this is not a document that was in

4    our or our client's possession at any time during our

5    preparation for the case, and we looked for it.  That's number

6    one.

7            Number two, the idea that this originated with Mr.

8    Hirst is itself the subject of proof to be presented to the

9    jury and decided on by them at the trial.  The Skype

10   transcripts that were presented today suggest on their face

11   that Mr. Hirst obtained the documents that he provided to

12   Mr. Hlavsa from somebody else.  So that's something to be

13   decided by the jury.  That is not a fact that can be

14   established for the purpose of this conversation.

15           THE COURT:  Thank you.

16           (Adjourned to September 16, 2016, at 3:00 p.m.)

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     MICHAEL HLAVSA

4     Cross By Mr. Tremonte  . . . . . . . . . . . 473

5                        DEFENDANT EXHIBITS

6     Exhibit No.                                Received
```
```
7     113  . . . . . . . . . . . . . . . . . . . 484

8     800  . . . . . . . . . . . . . . . . . . . 527

9     307  . . . . . . . . . . . . . . . . . . . 543

10    106  . . . . . . . . . . . . . . . . . . . 550

11    1244  . . . . . . . . . . . . . . . . . . 557

12    107  . . . . . . . . . . . . . . . . . . . 560

13    801  . . . . . . . . . . . . . . . . . . . 561

14    807  . . . . . . . . . . . . . . . . . . . 564

15    802  . . . . . . . . . . . . . . . . . . . 567

16    318  . . . . . . . . . . . . . . . . . . . 581

17    319  . . . . . . . . . . . . . . . . . . . 584

18    320  . . . . . . . . . . . . . . . . . . . 585

19    322  . . . . . . . . . . . . . . . . . . . 586

20    323  . . . . . . . . . . . . . . . . . . . 588

21    324  . . . . . . . . . . . . . . . . . . . 590

22    331  . . . . . . . . . . . . . . . . . . . 599

23    334  . . . . . . . . . . . . . . . . . . . 600

24    335  . . . . . . . . . . . . . . . . . . . 601

25    108  . . . . . . . . . . . . . . . . . . . 618
```

109   . . . . . . . . . . . . . . . . . . 622

201   . . . . . . . . . . . . . . . . . . 628

114   . . . . . . . . . . . . . . . . . . 632

203   . . . . . . . . . . . . . . . . . . 641

209   . . . . . . . . . . . . . . . . . . 646